## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GUILLERMO MARTI and FELICIA MARTI JT TEN, derivatively on behalf of CASSAVA SCIENCES, INC., | |
| Plaintiff, | Case No.: 1:24-cv-02223 |
| v. | |
| REMI BARBIER, ERIC J. SCHOEN, RICHARD J. BARRY, ROBERT Z. GUSSIN, MICHAEL J. O'DONNELL, SANFORD R. ROBERTSON, and PATRICK J. SCANNON, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| CASSAVA SCIENCES, INC., | |
| Nominal Defendant. | |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiffs Guillermo Marti and Felicia Marti JT Ten ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of Nominal Defendant Cassava Sciences, Inc. ("Cassava" or the "Company"), file this Verified Shareholder Derivative Complaint against Defendants Remi Barbier ("Barbier"), Eric J. Schoen ("Schoen"), Richard J. Barry ("Barry"), Robert Z. Gussin ("Gussin"), Michael J. O'Donnell ("O'Donnell"), Sanford R. Robertson ("Robertson"), and Patrick J. Scannon ("Scannon") (collectively, the "Individual Defendants" and with Cassava, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Cassava, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and for

1

contribution against Defendants Barbier and Schoen under 10(b) and 21D of the Exchange Act. As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cassava, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.  This is a shareholder derivative action that seeks to remedy wrongdoing committed by Cassava's directors and officers from August 18, 2022 and October 12, 2023, both dates inclusive (the "Relevant Period").

2.  Cassava is a Delaware biotechnology corporation based in Austin, Texas, which develops drugs for neurodegenerative diseases. Its lead therapeutic product candidate is "simufilam" which is a treatment for Alzheimer's disease. Its lead investigational diagnostic product is "SavaDx," a blood-based diagnostic test to detect Alzheimer's. Simufilam is designed to target a protein in the brain, filamin A ("FLNA"), and reverts it to a healthy conformation, combatting the effects of altered FLNA.

3.  The Company represents that it measures simufilam's effectiveness in restoring brain health by looking at cerebrospinal fluid ("CSF") biomarkers. A biomarker is a measurable indicator used to determine whether a patient is impacted by a specific condition. To analyze CSF biomarkers, Cassava scientists would measure CSF levels before and after a patient took

simufilam, with the expectation that, upon taking simufilam, the affected individual's CSF levels would decrease to a level indicative of a patient without Alzheimer's disease. Cassava began testing simufilam's effects on CSF biomarkers as early as March 2020, when the Company began a long-term open-label study.

4.      While the Company has big expectations for simufilam, it currently has no source of revenue, and therefore Cassava's overall financial success depends largely on successfully receiving regulatory approval for its lead product candidates in order to get them to market.

5.      Beginning in 2021, criticism regarding Cassava's research methods began to arise. In August 2021, a Citizen Petition was filed with the U.S. Food and Drug Administration ("FDA") requesting that phase 3 trials of simufilam be paused because of data manipulation. The Citizen Petition referenced "grave concerns about the quality and integrity of the laboratory-based studies surrounding this drug candidate and supporting the claims for its efficacy."

6.      In particular, the criticism was geared towards the method of Cassava's principal scientific advisor, Dr. Hoau-Yan Wang ("Dr. Wang") of City University of New York ("CUNY") Medical School. Dr. Wang has worked alongside Cassava scientists for fifteen years.

7.      The Company, however, denied the allegations and stood behind Dr. Wang's research and the effectiveness of simufilam. Cassava stated in a press release published shortly after the FDA received the Citizen Petition, "The Company stands behind its science, its scientists and its scientific collaborators."

8.      Beginning August 18, 2022, and throughout the Relevant Period, the Individual Defendants caused the Company to make materially false and misleading statements to the investing public concerning the accuracy and reliability of data the Company was holding out as

demonstrating simufilam's efficacy. In particular, the Company continued to defend its scientific data against growing criticism that its data was the result of severe scientific misconduct.

9.     On August 18, 2022, the Company issued a press release entitled "No Evidence of Data Manipulation in Science Publication on Simufilam" touting that "allegations of research misconduct are false" and that hopefully the "written pronouncements from neutral and independent science experts will help close the chapter of baseless attacks against out science."

10.    The Company continued to make similar statements to this one throughout the Relevant Period defending the research methods of Dr. Wang and the evidence supporting simufilam.

11.    The truth emerged on October 12, 2023, when *Science,* a peer-reviewed academic journal, published an article entitled "Co-developer of Cassava's Potential Alzheimer's Drug Cited for 'Egregious Misconduct'" (the "Article") revealing that CUNY Medical School had found evidence that Dr. Wang engaged in "deliberate scientific misconduct" involving 20 research papers. One such paper was a 2012 paper Dr. Wang published in *The Journal of Neuroscience*. This research paper, and others among the 20-such research papers, were foundational to Cassava receiving federal funding for developing simufilam and touting to the public the potential benefits of simufilam.

12.    The Article revealed that while CUNY requested the "original raw data" of Dr. Wang's research, Dr. Wang's research misconduct was so egregious he could not "turn over to the panel 'even a single datum or notebook in response to any allegations[.]"

13.    On this news, the Company's stock price fell from $17.34 per share at the close of trading on October 12, 2023 to $14.86 per share at the close of trading on October 13, 2023, representing a $2.68 decline per share, or 15.28%.

14. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) the Company's data control failures made the data that supported simufilam's efficacy susceptible to manipulation and had overstated the effectiveness of the drug; (3) as a result of manipulated data, the Company had misrepresented to the investing public the efficacy of its simufilam trials and the clinical and/or commercial prospects of simufilam; (4) the Company was subjected to heightened risks as a result of the substantial financial and reputational harm that would result from the foregoing being revealed; (5) the Company failed to maintain adequate internal controls; and (6) as a result, the Company's public statements were materially false and misleading at all times.

15. To make matters worse, during the Relevant Period the Individual Defendants solicited a proxy statement via Schedule 14A that was filed with the SEC on March 27, 2023 (the "2023 Proxy Statement"). The 2023 Proxy Statement solicited shareholders to: (1) re-elect Defendant Barry and Defendant Gussin to the Board; (2) approve an amendment to the Company's amended and restated certificate of incorporation to limit the liability of certain officers of the Company; (3) approve the Non-employee Director Compensation Program; (4) approve Ernst & Young ("EY") as the Company's independent registered public accounting firm for the fiscal year ending on December 31, 2023 (the "2023 Fiscal Year"); (5) approve, via non-binding advisory vote, the 2022 executive compensation of named executive officers; and (6) approve, via non-

binding advisory vote, the frequency of non-binding advisory votes on the executive compensation of the Company's named executive officers. All six solicitations were approved by shareholders according to a Form 8-K the Company filed with the SEC on May 8, 2023.

16.     As a direct result of the materially false and misleading elements in the 2023 Proxy Statement, the Individual Defendants materially benefited from the passing of the Non-Employee Director Compensation Program (the "Compensation Program"). The Compensation Program entitled the non-employee Director Individual Defendants to the following: (1) a $10,000 annual retainer; (2) an initial nonqualified stock option grant for the right to purchase 20,000 shares of the Company's common stock; (3) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares of Company's common stock; and (4) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of the Company's common stock for service on one committee or 5,000 shares of the Company's common stock for service on two or more committees. Thus, the 2023 Proxy Statement provided a material benefit to Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon, all of whom are entitled to the payments laid out in the Compensation Program.

17.     If not for the false and misleading statements throughout the Relevant Period and for the false and misleading elements in the 2023 Proxy Statement, Cassava shareholders would not have voted to approve the Compensation Program. Accordingly, the Individual Defendants materially benefited as a result of the scheme to cause the Company to make false and misleading statements.

18.     Moreover, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact. Additionally, in breach of their fiduciary duties, the Individual

Defendants caused the Company to fail to maintain adequate internal controls.

19.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Illinois (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

20.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of certain directors' and officers' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C.

§ 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. In addition, the Company's principal executive offices are located in this District.

## PARTIES

### Plaintiffs

26.     Plaintiffs are current shareholders of Cassava. Plaintiffs have continuously held Cassava common stock at all relevant times.

### Nominal Defendant Cassava

27.     Cassava is a Delaware corporation with its principal executive offices at 6801 N. Capital of Texas Highway, Building 1, Suite 300, Austin, Texas 78731. Cassava's shares trade on the Nasdaq Capital Market ("Nasdaq") under the ticker symbol "SAVA."

### Defendant Barbier

28.     Defendant Barbier is the Company's President, CEO, and Chairman of the Board, and has served in all three roles since he founded the Company in May 1998. According to the 2023 Proxy Statement, as of March 16, 2023, Defendant Barbier beneficially owned 2,031,594

shares of the Company's common stock, representing 4.8% of the Company's outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 16, 2023 was $26.75, Defendant Barbier owned approximately $54 million worth of Cassava stock as of that date.

29.     For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Barbier received $1,114,998 in total compensation from the Company. This included $1.1 million in salary and $14,998 in all other compensation.

30.     The 2023 Proxy Statement stated the following about Defendant Barbier:

*Remi Barbier*, the Company's founder, has served as President, Chief Executive Officer and Chairman of the Board of Directors since the Company's inception in May 1998. Prior to that time, Mr. Barbier helped in the growth or founding of Exelixis Inc., a publicly-traded drug development company, ArQule, Inc., a drug development company acquired by Merck & Co., and EnzyMed, Inc., a chemistry company acquired by Albany Molecular Research, Inc. Mr. Barbier is a trustee emeritus of the Carnegie Institute of Washington, the Santa Fe Institute and the Advisory Board of the University of California Institute for Quantitative Biosciences. He is on the board of BioVentures LLC, a life science incubator at the University of Arkansas for Medical Sciences. Mr. Barbier received his B.A. from Oberlin College and his M.B.A. from the University of Chicago.

**Defendant Schoen**

31.     Defendant Schoen has served as the Company's CFO since October 2018. According to the 2023 Proxy Statement, as of March 16, 2021, Defendant Schoen beneficially owned 71,800 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 16, 2023 was $26.75, Defendant Schoen owned approximately $1.9 million worth of Cassava stock as of that date.

32.     For the 2022 Fiscal Year, Defendant Schoen received $425,000 in total compensation from the Company. This included $425,000 in salary and $1,610 in all other compensation.

33. The 2023 Proxy Statement stated the following about Defendant Schoen:

*Eric Schoen* has served as Chief Financial Officer since October 2018. Prior to joining the Company, Mr. Schoen served in numerous financial leadership roles. Most recently, he served as Vice President, Senior Vice President, Finance and Chief Accounting Officer of Aspira Women's Health Inc. (formerly Vermillion, Inc.), a publicly-held women's health company, from 2011 to 2017. Mr. Schoen also began his career and spent nine years with PricewaterhouseCoopers in the audit and assurance, transaction services and global capital markets practices. Mr. Schoen received his B.S. in Finance from Santa Clara University.

**Defendant Barry**

34. Defendant Barry has served as a Company director since June 2021. He also serves as the Chair of the Audit Committee and the Chair of the Nominating and Governance Committee. According to the 2023 Proxy Statement, as of March 16, 2023, Defendant Barry beneficially owned 275,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 16, 2023 was $26.75, Defendant Barry owned approximately $7.3 million worth of Cassava stock as of that date.

35. The 2023 Proxy Statement stated the following about Defendant Barry:

*Richard J. Barry* has served as a director since June 2021. Since June 2015, Mr. Barry has also served as a director of Sarepta Therapeutics, Inc., (Nasdaq: SRPT). Mr. Barry has extensive experience in the investment management business. He was a founding member of Eastbourne Capital Management LLC, and served as a Managing General Partner and Portfolio Manager from 1999 to its close in 2010. Prior to Eastbourne, Mr. Barry was a Portfolio Manager and Managing Director of Robertson Stephens Investment Management. Mr. Barry holds a Bachelor of Arts from Pennsylvania State University.

**Defendant Gussin**

36. Defendant Gussin has served as a Company director since March 2003. He also serves as a member of both the Audit Committee and Compensation Committee. According to the 2023 Proxy Statement, as of March 16, 2023, Defendant Gussin beneficially owned 142,537 shares of the Company's common stock. Given that the price per share of the Company's common stock

at the close of trading on March 16, 2023 was $26.75, Defendant Gussin owned approximately

$3.8 million worth of Cassava stock as of that date.

37.     The 2023 Proxy Statement stated the following about Defendant Gussin:

*Robert Z. Gussin, Ph.D.* has served as a director since March 2003. Dr. Gussin worked at Johnson & Johnson for 26 years, most recently as Chief Scientific Officer and Corporate Vice President, Science and Technology from 1986 through his retirement in 2000. Dr. Gussin served on the board of directors of Duquesne University and the advisory boards of the Duquesne University Pharmacy School and the University of Michigan Medical School Department of Pharmacology. Dr. Gussin received his B.S. and M.S. degrees and D.Sc. with honors from Duquesne University and his Ph.D. in Pharmacology from the University of Michigan, Ann Arbor.

### Defendant O'Donnell

38.     Defendant O'Donnell has served as a Company director since June 1998. According to the 2023 Proxy Statement, as of March 16, 2023, Defendant O'Donnell beneficially owned 89,666 shares of Company common stock. Given that the price per share of the Company common stock was $26.75 at the close of trading on March 16, 2023, Defendant O'Donnell owned approximately $2.39 million worth of Cassava common stock as of that date.

39.     The 2023 Proxy Statement stated the following about Defendant O'Donnell:

*Michael J. O'Donnell, Esq*. has served as a director since June 1998. Mr. O'Donnell has been a partner in the law firm of Orrick, Herrington & Sutcliffe LLP since June 2021. Orrick, Herrington & Sutcliffe LLP is the Company's corporate counsel and provides legal services to the Company. Previously, Mr. O'Donnell was a member of Morrison & Foerster LLP from 2011 to 2021. Mr. O'Donnell serves as corporate counsel to numerous public and private biopharmaceutical and life sciences companies. Previously, Mr. O'Donnell was a member of Wilson Sonsini Goodrich & Rosati. Mr. O'Donnell received his J.D., cum laude, from Harvard University and his B.A. from Bucknell University, summa cum laude.

### Defendant Robertson

40.     Defendant Robertson has served as a Company director since September 1998. He serves as a member on each of the Audit Committee, the Compensation Committee, and the

Nominating and Governance Committee. In addition, he serves as Lead Director. According to the 2023 Proxy Statement, as of March 16, 2023, Defendant Robertson beneficially owned 1,161,694 shares of Company common stock. Given that the price per share of the Company common stock was $26.75 at the close of trading on March 16, 2023, Defendant Robertson owned approximately $31 million worth of Cassava common stock as of that date.

41.     The 2023 Proxy Statement stated the following about Defendant Robertson:

*Sanford R. Robertson* has served as a director since September 1998. Mr. Robertson has been a partner of Francisco Partners, a technology buyout fund, since 1999. Prior to founding Francisco Partners, Mr. Robertson was the founder and chairman of Robertson, Stephens & Company, a technology investment bank sold to BankBoston in 1998. Mr. Robertson is the lead director of Salesforce.com, a publicly-held provider of enterprise cloud computing applications. Mr. Robertson received his B.A. and M.B.A. degrees with distinction from the University of Michigan.

**Defendant Scannon**

42.     Defendant Scannon has served as a Company director since December 2007. During the Relevant Period, he served on the Audit Committee. According to the 2023 Proxy Statement, as of March 16, 2023, Defendant Scannon beneficially owned 92,955 shares of Company common stock. Given that the price per share of the Company common stock was $26.75 at the close of trading on March 16, 2023, Defendant Scannon owned approximately $2.48 million worth of Cassava common stock as of that date.

43.     The 2023 Proxy Statement stated the following about Defendant Scannon:

*Patrick J. Scannon, M.D., Ph.D.* has served as a director since December 2007. Dr. Scannon is one of the founders of XOMA. From 2006 to 2016, Dr. Scannon was Executive Vice President, Chief Biotechnology Officer of XOMA. From 1993 to 2006, Dr. Scannon served as Chief Scientific and Medical Officer of XOMA. Dr. Scannon retired from XOMA and resigned from XOMA's board of directors in 2016. Dr. Scannon received his Ph.D. in organic chemistry from the University of California, Berkeley and his M.D. from the Medical College of Georgia.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

44. By reason of their positions as officers, directors, and/or fiduciaries of Cassava and because of their ability to control the business and corporate affairs of Cassava, the Individual Defendants owed Cassava and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Cassava in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Cassava and its shareholders so as to benefit all shareholders equally.

45. Each director and officer of the Company owes to Cassava and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

46. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cassava, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

47. To discharge their duties, the officers and directors of Cassava were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

48. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Cassava, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Cassava's Board at all relevant times.

49.     As the senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

50.     To discharge their duties, the officers and directors of Cassava were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Cassava were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Cassava Sciences' Code of Ethics (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Cassava conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Cassava and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Cassava's operations would comply with all applicable laws and Cassava's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

51.     Each of the Individual Defendants further owed to Cassava and the shareholders the duty of loyalty requiring that each favor Cassava's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

52.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Cassava and were at all times acting within the course and scope of such agency.

53.     Because of their advisory, executive, managerial, directorial, and controlling positions with Cassava, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

54.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Cassava.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

55.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

56.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal

adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

57. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Cassava was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

58. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

59. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Cassava and was at all times acting within the course and scope of such agency.

## CASSAVA'S CODE OF ETHICS AND CORPORATE GOVERNANCE

### Cassava's Code of Ethics

60. Cassava's Code of Ethics lists its purposes, which includes to:

• Promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

• Promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to the U.S. Securities and Exchange Commission and in other public communications made by the Company;

• Promote compliance with applicable governmental laws, rules and regulations;

• Promote the prompt internal reporting of violations of the Code to appropriate persons of authority within the Company; and

• Promote accountability for adherence to the Code.

61.     Moreover, the Company's Code of Ethics states that:

All directors, officers and employees of the Company will:

1.     Act with honesty and integrity, avoiding actual or apparent conflicts between personal and the interests of the Company, including refraining from receiving improper personal benefits as a result of holding a particular position with the Company;

*          *          *

3.     Where applicable, provide the U.S. Securities and Exchange Commission (the "Commission") and the public with complete, fair, accurate, timely and understandable disclosure in periodic reports and other documents filed or submitted to the Commission and in other public communications;

4.     Endeavor to comply with applicable laws and regulations of federal, state, local and foreign governments and government agencies having jurisdiction over the Company, and with applicable regulations of private or self-regulatory authorities having jurisdiction over the Company;

5.     Act in good faith, responsibly with due care and diligence and without misrepresentation or omission of material facts and strive to maintain independent judgment in the performance and fulfillment of their duties and responsibilities;

6.     Promote ethical behavior among subordinates and peers at the Company[.]

62.     Finally, with regard to reporting violations of the Code of Ethics itself, the Code of

Ethics further provides that: "It is the duty of each director, officer and employee of the Company

to report violations of the Code promptly to the attention of the Company's [CEO], [CFO], or to any member of the Audit Committee of the Board[.]"

### *Audit Committee Charter*

63.     The Company's Audit Committee Charters states that among the Audit Committee's purposes "shall be to make such examinations as are necessary to monitor the Company's system of internal controls [and] to provide the Company's Board of Directors with the results of its examinations and recommendations derived therefrom[.]"

64.     The Audit Committee Charter also describes the Audit Committee's responsibilities which include "[r]eviewing on a continuing basis the adequacy of the Company's system of internal controls" and "[r]eviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements[.]"

65.     The Individual Defendants violated the Code of Ethics by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings; by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act; and by failing to report the same. Moreover, the Individual Defendants violated the Code of Ethics by failing to act with honesty and integrity; failing to provide the SEC and public with complete, fair, accurate, timely, and understandable disclosures; failing to comply with applicable laws and regulations; failing to act in good faith, responsibly with due care and diligence and without misrepresentation or omission of material facts; failing to promote ethical behavior at the Company; and failing to promptly report violations of the Code of Ethics. Further in violation of the Audit Committee

Charter, Defendants Barry, Gussin, and Sanford failed to adequately review the Company's internal controls as well as the Company's SEC filings.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

66.     Cassava is a biotechnology company that has a product portfolio including simufilam, its lead therapeutic product candidate, and SavaDx, its lead investigational diagnostic product candidate. Simufilam is an Alzheimer's treatment, and SavaDx is a test to detect the presence of Alzheimer's before the appearance of clinical symptoms.

67.     One of the Company's much larger competitors, Biogen Inc. ("Biogen"), recently received FDA approval for its Alzheimer's treatment, Aduhelm. However, if given FDA approval, simufilam represents an appealing potential alternative to Aduhelm because simufilam is taken orally, rather than intravenously like Aduhelm, and is expected to be much cheaper than Aduhelm, which costs approximately $56,000 per patient per year.

68.     Cassava is under great pressure to get one or both of its lead product candidates to market, given that, according to the Company's most recent Form 10-Q filed with the SEC on November 7, 2023, Cassava "ha[s] yet to generate any revenues from product sales" and "ha[s] an accumulated deficit of $359.9 million at September 30, 2023."

69.     Immediately prior to the Relevant Period, the Company was finalizing the results of its simufilam Phase 2b clinical trials as it attempted to advance to Phase 3 of the FDA approval process. However, the foundational science the Company used to support its claims of simufilam's effectiveness was based on a series of papers from two coauthors, Dr. Wang of CUNY and Dr. Lindsay Burns of Cassava. While the clinical trials the Company conducted purportedly showed simufilam's effectiveness, later analyses presented in a Citizen Petition to the FDA would show

that the data from these trials had been manipulated. According to the Citizen Petition, no other labs were able to confirm Cassava's research regarding simufilam.

**False and Misleading Statements Made During the Relevant Period**

*August 18, 2022 Press Release*

70.     On August 18, 2022, the Company issued a press release entitled "No Evidence of Data Manipulation in Science Publication on Simufilam" (the "August 18, 2022 Press Release"). The press release stated, in relevant part:

> Cassava [. . .] was recently informed by the *Journal of Prevention of Alzheimer's Disease* (JPAD) that there is no convincing evidence to support allegations of data manipulation in a 2020 paper on simufilam co-authored by the Company's personnel and its science collaborators.
>
> ***
>
> ***"From the onset, I have said that allegations of research misconduct are false, and for good reason – I see no supporting evidence for the allegations,"*** said Remi Barbier, President & CEO. ***"I'm hopeful that written pronouncements from neutral and independent science experts will help close the chapter of baseless attacks against our science. At some point it becomes irrational for our detractors to repeat over and over again the same old tired mantra of data manipulation."[1]***
>
> ***
>
> A related investigation by academic authorities at The City University of New York (CUNY) is ongoing. Pending a public response from CUNY, both *Neurobiology of Aging* and *Journal of Neuroscience* previously issued an outstanding "expression of concern", which is a non-standardized type of editorial notice used by academic publishers to raise awareness to a possible problem, according to the Council of Science Editors (2012).

71.     The August 18, 2022 press release was false and misleading and failed to disclose that: (1) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) the Company's data control failures made the data

---

[1] Unless otherwise indicated, all emphasis is added.

that supported simufilam's efficacy susceptible to manipulation and had overstated the effectiveness of the drug; (3) as a result of manipulated data, the Company had misrepresented to the investing public the efficacy of its simufilam trials and the clinical and/or commercial prospects of simufilam; (4) the Company was subjected to heightened risks as a result of the substantial financial and reputational harm that would result from the foregoing being revealed; (5) the Company failed to maintain adequate internal controls; and (6) as a result, the Company's public statements were materially false and misleading at all times.

### *November 7, 2022 Press Release*

72.     On November 7, 2022, the Company issued a press release entitled "Cassava Sciences Reports Third Quarter Financial Results for 2022 and Business Updates" (the "November 7, 2022 Press Release"). The press release contained a quote from Defendant Barbier, in which he stated:

> The clinical development of oral simufilam for Alzheimer's disease continues to make headway[.] . . . We now have over 650 patients enrolled in our on-going Phase 3 studies of simufilam in Alzheimer's disease, up from 150 patients approximately six months ago. We also look forward to presenting new clinical data for simufilam from two other ongoing studies in Alzheimer's disease.

73.     The November 7, 2022 Press Release was false and misleading and failed to disclose that: (1) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) the Company's data control failures made the data that supported simufilam's efficacy susceptible to manipulation and had overstated the effectiveness of the drug; (3) as a result of manipulated data, the Company had misrepresented to the investing public the efficacy of its simufilam trials and the clinical and/or commercial prospects of simufilam; (4) the Company was subjected to heightened risks as a result of the substantial financial and reputational harm that would result from the foregoing being revealed; (5) the

Company failed to maintain adequate internal controls; and (6) as a result, the Company's public statements were materially false and misleading at all times.

### *January 24, 2023 Press Release*

74. On January 24, 2023, the Company issued a press release entitled "Cassava Sciences Announces Positive Top-Line Clinical Results in Phase 2 Study Evaluating Simufilam in Alzheimer's Disease." The press release stated, in relevant part:

> Cassava [. . .] today announced positive top-line Phase 2 results for simufilam, its oral drug candidate for Alzheimer's disease dementia. This was an open-label safety study with exploratory efficacy endpoints. The study enrolled over 200 patients with mild-to-moderate Alzheimer's disease (MMSE 16-26). Study participants were administered open-label simufilam tablets 100mg twice daily for 1 year or more. Endpoints were measured at baseline (study entry) and month 12.
>
> ***
>
> "I'm very excited about these 1-year data," said [Defendant] Barbier[.] "They add strength and determination to our goal of helping people fight Alzheimer's disease. Simufilam is an innovative drug candidate that we are developing methodically, one study at a time, and this open-label safety study served its purpose. Next up in 2023 are top-line clinical results of our Cognition Maintenance Study, which is a randomized, controlled trial."

75. The January 24, 2023 Press Release was false and misleading and failed to disclose that: (1) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) the Company's data control failures made the data that supported simufilam's efficacy susceptible to manipulation and had overstated the effectiveness of the drug; (3) as a result of manipulated data, the Company had misrepresented to the investing public the efficacy of its simufilam trials and the clinical and/or commercial prospects of simufilam; (4) the Company was subjected to heightened risks as a result of the substantial financial and reputational harm that would result from the foregoing being revealed; (5) the

Company failed to maintain adequate internal controls; and (6) as a result, the Company's public statements were materially false and misleading at all times.

### February 28, 2023 Press Release

76.     On February 28, 2023, the Company issued a press release entitled "Cassava Sciences Reports Full-year 2022 Financial Results and Operating Updates" (the "February 28, 2023 Press Release"). The February 28, 2023 Press Release included a quote from Defendant Barbier, who stated:

> Setting aside headwinds, 2022 was highlighted by positive developments with patient enrollment in our Phase 3 clinical studies of simufilam in Alzheimer's disease[.] . . . Over 1,000 patients with Alzheimer's are now enrolled in these two studies. By year-end 2023, we expect to reach our enrollment target of approximately 1,750 patients for the Phase 3 studies. Recently, we announced top-line results for an open-label study. In this study, over 200 mild-to-moderate Alzheimer's patients were treated with simufilam for a year. Simufilam was well-tolerated, 47% of patients improved on ADAS-Cog scores over 12 months and an additional 23% of patients declined less than 5 points on ADAS-Cog. I believe these are noteworthy trial results, even as I am keenly aware that the gold standard in Alzheimer's research requires results from randomized, controlled studies."

77.     The February 28, 2023 Press Release was false and misleading and failed to disclose that: (1) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) the Company's data control failures made the data that supported simufilam's efficacy susceptible to manipulation and had overstated the effectiveness of the drug; (3) as a result of manipulated data, the Company had misrepresented to the investing public the efficacy of its simufilam trials and the clinical and/or commercial prospects of simufilam; (4) the Company was subjected to heightened risks as a result of the substantial financial and reputational harm that would result from the foregoing being revealed; (5) the Company failed to maintain adequate internal controls; and (6) as a result, the Company's public statements were materially false and misleading at all times.

*2022 Form 10-K*

78.     Also on February 28, 2023, the Company filed its annual report for the Fiscal Year 2022 on Form 10-K with the SEC (the "2022 10-K"). The 2022 10-K was signed by Defendants Barbier, Schoen, Barry, Gussin, O'Donnell, Robertson, and Scannon. Attached to the 2022 10-K were signed certifications pursuant to Sarbanes Oxley Act ("SOX") by Defendants Barbier and Schoen attesting to its accuracy, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of any and all fraud.

79.     Under the heading "Overview," the 2022 10-K stated the following, in relevant part:

> Cassava [. . .] is a clinical-stage biotechnology company based in Austin, Texas. Our mission is to detect and treat neurodegenerative diseases, such as Alzheimer's disease. Our novel science is based on stabilizing – but not removing – a critical protein in the brain. Our lead therapeutic drug candidate, simufilam, is being evaluated for the proposed treatment of Alzheimer's disease dementia in Phase 3 clinical studies.

> Over the past 10 years, we have combined state-of-the-art technology with new insights in neurobiology to develop novel solutions for Alzheimer's disease and other neurodegenerative diseases. Our strategy is to leverage our unique scientific/clinical platform to develop a first-in-class program for treating neurodegenerative diseases, such as Alzheimer's.

> ***

> Our scientific approach for the treatment of Alzheimer's disease seeks to simultaneously suppress both neurodegeneration and neuroinflammation. We believe our ability to improve multiple vital functions in the brain represents a new, different and crucial approach to address Alzheimer's disease.

> Our lead product candidate, simufilam, is a proprietary small molecule (oral) drug. Simufilam targets an altered form of a protein called filamin A (FLNA) in the Alzheimer's brain. Published studies have demonstrated that the altered form of FLNA causes neuronal dysfunction, neuronal degeneration and neuroinflammation. We are currently conducting a Phase 3 program with simufilam in patients with mild-to-moderate Alzheimer's disease dementia.

We believe simufilam improves brain health by reverting altered FLNA back to its native, healthy conformation, thus countering the downstream toxic effects of altered FLNA. We have generated and published experimental and clinical evidence of improved brain health with simufilam. Importantly, simufilam is not dependent on clearing amyloid from the brain. Since simufilam has a unique mechanism of action, we believe its potential therapeutic effects may be additive or synergistic with those of other therapeutic candidates aiming to treat neurodegeneration.

80.     Additionally, the 2022 10-K stated the following regarding the Company's scientific approach:

Our scientific approach is to treat neurodegeneration by targeting an altered form of a scaffold protein called FLNA. Through years of basic research, we and our academic collaborators identified FLNA as a structurally altered protein that enables both a neurodegeneration and a neuroinflammation pathway in the Alzheimer's brain. We have shown that the altered form of FLNA is pervasive in the Alzheimer's brain and undetectable in healthy control brains.

Using scientific insight and lab techniques, we believe we have elucidated this protein dysfunction. Through this work, we have produced experimental evidence that altered FLNA plays a critical role in Alzheimer's disease. We engineered a family of high-affinity, small molecules to target this structurally altered protein and restore its normal shape and function. This family of small molecules, including our lead therapeutic candidate, simufilam, was designed in-house and characterized by our academic collaborators.

Our lead therapeutic product candidate, simufilam, is a small molecule (oral) drug with a novel mechanism of action. The target of simufilam is altered FLNA, the brain protein we seek to stabilize. Importantly, since simufilam has a unique mechanism of action, we believe its potential therapeutic effects may be additive or synergistic with those of other therapeutic candidates aiming to treat neurodegeneration. We are currently conducting a Phase 3 program with simufilam in patients with mild-to-moderate Alzheimer's disease dementia.

Given the biopharmaceutical industry's challenging track record in Alzheimer's research, we believe there is an urgent need to consider innovative approaches to combat this disease. We believe our scientific approach may broaden the range of possible treatment approaches for this complex disease.

81.     Additionally, the 2022 10-K touted the Company's development team, stating: "Our product development team is led by seasoned professionals with a proven track record of innovation in drug discovery and development, as well as substantial business expertise."

82.     In a section titled "Our Strategy," the 2022 10-K stated:

Our goal is to develop product candidates to diagnose and treat neurodegeneration, such as Alzheimer's disease. Key elements of our business strategy to achieve this mission include:

- building a lean company that is narrowly focused on developing innovative product candidates for Alzheimer's disease and other areas of neurodegeneration;

- validating our unique scientific approach with competitive research grants and publishing our scientific data in peer-reviewed journals;

- applying our development capabilities to advance our product candidates through clinical proof-of-concept studies and beyond;

- using our expertise and experience to continue to focus on discovering new indications and product candidates, validated by experimental evidence and leading experts in the field; and

- continuing to outsource preclinical studies, clinical studies and formulation development activities in order to allow more efficient deployment of our resources

83.     The 2022 10-K was false and misleading and failed to disclose that: (1) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) the Company's data control failures made the data that supported simufilam's efficacy susceptible to manipulation and had overstated the effectiveness of the drug; (3) as a result of manipulated data, the Company had misrepresented to the investing public the efficacy of its simufilam trials and the clinical and/or commercial prospects of simufilam; (4) the Company was subjected to heightened risks as a result of the substantial financial and reputational harm that would result from the foregoing being revealed; (5) the Company failed to maintain adequate internal controls; and (6) as a result, the Company's public statements were materially false and misleading at all times.

***2023 Proxy Statement***

84.     On March 27, 2023, the Company filed with the SEC its 2023 Proxy Statement. The 2023 Proxy Statement was solicited by Defendants Barbier, Barry, Gussin, O'Donnell, Robertson, and Scannon.

85.     The 2023 Proxy Statement solicited shareholders to, *inter alia*: (1) re-elect Defendant Barry and Defendant Gussin to the Board; (2) approve an amendment to the Company's amended and restated certificate of incorporation to limit the liability of certain officers of the Company; (3) approve the Non-employee Director Compensation Program; (4) approve EY as the Company's independent registered public accounting firm for the 2023 Fiscal Year; (5) approve, via non-binding advisory vote, the 2022 executive compensation of named executive officers; and (6) approve, via non-binding advisory vote, the frequency of non-binding advisory votes on the executive compensation of the Company's named executive officers. All six solicitations were approved by shareholders according to a Form 8-K the Company filed with the SEC on May 8, 2023.

86.     As a direct result of the materially false and misleading elements in the 2023 Proxy Statement, the Individual Defendants materially benefited from the passing of the Compensation Program. The Compensation Program entitled the non-employee Director Individual Defendants to the following: (1) a $10,000 annual retainer; (2) an initial nonqualified stock option grant for the right to purchase 20,000 shares of the Company's common stock; (3) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares of Company's common stock; and (4) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of the Company's common stock for service on one committee or 5,000 shares of the Company's common stock for service on two or more committees. Thus, the 2023 Proxy Statement provided a material benefit to

Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon, all of whom are entitled to the payments laid out in the Compensation Program.

87.　Because of the false and misleading elements of the 2023 Proxy Statement, Company shareholders approved the Compensation Program. As a result, Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon received the following compensatory benefits over the next 36 months: (1) a $10,000 annual retainer; (2) an initial nonqualified stock option grant for the right to purchase 20,000 shares of the Company's common stock; (3) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares of Company's common stock; and (4) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of the Company's common stock for service on one committee or 5,000 shares of the Company's common stock for service on two or more committees. As a group, Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon are collectively entitled to $150,000 and 245,000 in shares and options.

88.　Regarding risk oversight, the 2023 Proxy Statement stated:

***One of the key functions of the Board of Directors is informed oversight of the risk management process***. The Board administers this oversight function directly through the Board of Directors as a whole, as well as through its standing committees that address risks inherent in their respective areas of oversight. Areas of focus include economic, operational, financial (accounting, credit, investment, liquidity and tax), competitive, legal, regulatory, cybersecurity, privacy, compliance and reputational risks, and risk exposures related to COVID-19. ***The risk oversight responsibility of the Board of Directors and its committees is supported by the management reporting processes, which are designed to provide visibility to the Board of Directors and to the personnel who are responsible for risk assessment and information about the identification, assessment and management of critical risks, and management's risk mitigation strategies.***

The Audit Committee is responsible for reviewing and discussing major financial risk exposures and the steps management has taken to monitor and control these exposures, including guidelines and policies with respect to risk assessment and risk management. ***The Audit Committee also monitors compliance with legal and regulatory requirements and assists the Board of Directors in fulfilling its***

***oversight responsibilities with respect to risk management.*** The Compensation Committee assesses and monitors whether any of the compensation policies and programs has the potential to encourage excessive risk-taking.

***The Company believes this division of responsibilities is an effective approach for addressing the risks the Company faces and that the board leadership structure supports this approach***.

89. The 2023 Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the 2023 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements to the investing public, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder approval of the Compensation Program, which provided material benefits to Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon.

90. The 2023 Proxy Statement also failed to disclose that: (1) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) the Company's data control failures made the data that supported simufilam's efficacy susceptible to manipulation and had overstated the effectiveness of the drug; (3) as a result of manipulated data, the Company had misrepresented to the investing public the efficacy of its simufilam trials and the clinical and/or commercial prospects of simufilam; (4) the Company was subjected to heightened risks as a result of the substantial financial and reputational harm that would result from the foregoing being revealed; (5) the Company failed to maintain adequate internal controls; and (6) as a result, the Company's public statements were materially false and misleading at all times.

91.     As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders reelected Defendants Barry and Gussin to the Board, allowing them to continue to breach their fiduciary duties to Cassava; ratified EY as the independent auditor, approved on a nonbinding advisory basis, the 2023 Fiscal Year compensation for Defendants Barbier and Schoen, and the Compensation Program, thereby providing material benefits to Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon who were engaged in the misconduct.

***May 1, 2023, Press Release***

92.     On May 1, 2023, the Company issued a press release entitled "Cassava Sciences Reports Q1 2023 Financial Results and Operating Updates" (the "May 1, 2023 Press Release"). The press release quoted Defendant Barbier, who stated the following, in relevant part:

> In Q1 2023, we announced results of a one-year, open-label Phase 2 safety study of simufilam in over 200 patients with Alzheimer's disease[.] . . . The dataset for this study shows long-term safety for simufilam. Notably, the data also show differences in changes in ADAS-Cog scores in mild and moderate subgroups. ***We believe this is an encouraging result, as it clearly shows an improvement in ADAS-Cog over 1 year in mild patients taking simufilam that is well outside the expected range of historical placebo decline from numerous other studies***.

93.     The May 1, 2023 Press Release was false and misleading and failed to disclose that: (1) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) the Company's data control failures made the data that supported simufilam's efficacy susceptible to manipulation and had overstated the effectiveness of the drug; (3) as a result of manipulated data, the Company had misrepresented to the investing public the efficacy of its simufilam trials and the clinical and/or commercial prospects of simufilam; (4) the Company was subjected to heightened risks as a result of the substantial financial and reputational harm that would result from the foregoing being revealed; (5) the

Company failed to maintain adequate internal controls; and (6) as a result, the Company's public statements were materially false and misleading at all times.

### *July 5, 2023 Press Release*

94. On July 5, 2023, Cassava issued a press release entitled "Oral Simufilam Slowed Cognitive Decline in a Randomized Withdrawal Trial of Mild-to-Moderate Alzheimer's Disease" (the "July 5, 2023 Press Release"). The July 5, 2023 Press Release quoted Defendant Barbier, who stated:

> Patients started out taking open-label simufilam for 12 months prior to enrolling in the CMS[.] . . . CMS patients on placebo were, in effect, withdrawn from simufilam for 6 months. This placebo arm declined while the CMS arm randomized to simufilam improved. *We believe the emerging separation of cognitive scores between these two arms represents a drug effect.*

95. The July 5, 2023 Press Release was false and misleading and failed to disclose that: (1) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) the Company's data control failures made the data that supported simufilam's efficacy susceptible to manipulation and had overstated the effectiveness of the drug; (3) as a result of manipulated data, the Company had misrepresented to the investing public the efficacy of its simufilam trials and the clinical and/or commercial prospects of simufilam; (4) the Company was subjected to heightened risks as a result of the substantial financial and reputational harm that would result from the foregoing being revealed; (5) the Company failed to maintain adequate internal controls; and (6) as a result, the Company's public statements were materially false and misleading at all times.

### *August 3, 2023 Press Release*

96. On August 3, 2023, Cassava issued a press release announcing the Company's Q2 2023 financial results (the "August 3, 2023 Press Release"). The August 3, 2023 Press Release quoted Defendant Barbier, who stated:

> In July 2023, we announced clinical results of a randomized controlled trial with oral simufilam in over 150 patients with Alzheimer's disease[.] . . . ***In this study simufilam treatment for 6 months slowed cognitive decline by 38% versus placebo over six-month in patients with mild-to-moderate Alzheimer's disease. In addition, oral simufilam continues to be safe, well-tolerated. We believe these clinical results are noteworthy.***

97. The August 3, 2023 Press Release was false and misleading and failed to disclose that: (1) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) the Company's data control failures made the data that supported simufilam's efficacy susceptible to manipulation and had overstated the effectiveness of the drug; (3) as a result of manipulated data, the Company had misrepresented to the investing public the efficacy of its simufilam trials and the clinical and/or commercial prospects of simufilam; (4) the Company was subjected to heightened risks as a result of the substantial financial and reputational harm that would result from the foregoing being revealed; (5) the Company failed to maintain adequate internal controls; and (6) as a result, the Company's public statements were materially false and misleading at all times.

### The Truth Emerges

98. On October 12, 2023, *Science*, a peer-reviewed academic journal, published the Article. The Article revealed that Dr. Wang's investigation at CUNY had concluded, stating:

> Cassava Sciences, a biotech company whose work on the experimental Alzheimer's drug simufilam has been heavily criticized and is the subject of ongoing federal probes, has suffered another blow. A much-anticipated investigation by the City University of New York has accused neuroscientist Hoau-Yan Wang, a CUNY faculty member and longtime Cassava collaborator, of scientific misconduct involving 20 research papers. Many provided key support for simufilam's jump

from the lab into clinical studies and, given the CUNY report, some scientists are now calling for the two ongoing trials to be suspended.

99. Further, the Article revealed the investigative committee had found clear examples of data manipulation, stating:

The investigative committee found numerous signs that images were improperly manipulated, for example in a 2012 paper in *The Journal of Neuroscience* that suggested simufilam can blunt the pathological effects of beta amyloid, a protein widely thought to drive Alzheimer's disease. It also concluded that Lindsay Burns, Cassava's senior vice president for neuroscience and a co-author on several of the papers, bears primary or partial responsibility for some of the possible misconduct or scientific errors.

100. The Article noted that Dr. Wang failed to produce any of his original wrong data, stating:

The committee could not prove its suspicions, however, because Wang did not produce the original raw data. Instead, the panel says its finding of wrongdoing was based on "long-standing and egregious misconduct in data management and record keeping by Dr. Wang."

The 50-page report obtained by *Science* says the scientist failed to turn over to the panel "even a single datum or notebook in response to any allegation" and cites "Wang's inability or unwillingness to provide primary research materials to this investigation" as a "deep source of frustration."

101. The Article also explained why CUNY had launched an investigation into Dr. Wang, stating:

The CUNY investigation into Wang began in the fall of 2021, in response to allegations from other investigators that were forwarded by the Office of Research Integrity (ORI), the federal entity that oversees work funded by the National Institutes of Health. NIH provided millions of dollars for work by Wang and Burns, including about $1.2 million to Wang since December 2020. The investigation was not completed until this year, in May, according to emails obtained by *Science*. The four-member investigative panel of researchers, led by CUNY neuroscientist Orie Shafer, encountered delays beyond its failed efforts to obtain raw data from Wang. For 6 months, university officials stonewalled the panel's requests for image files confiscated from Wang's computers, according to the report. The investigators received the files only after appealing directly to Vincent Boudreau, president of CCNY.

34

102.    The Article quoted a colleague of Dr. Wang, stating:

CUNY biochemist Kevin Gardner, who helped prepare a preliminary assessment of Wang's work but was not involved in the final review, calls what the panel found "embarrassing beyond words." Wang's record of research is "abhorrent," he says. That this work has supported clinical trials, Gardner adds, "makes it doubly sickening."

103.    The Article explained the aftermath of the investigation, stating:

**_The CUNY investigators recommended that journals retract the Wang papers they had probed if he can't provide original data._** Multiple journals have already done so, after Schrag notified them of his findings**_. The investigators noted that PLOS ONE, which retracted five of Wang's papers, "discovered evidence of research misconduct in his response to the concerns raised."_** Other journals, including _The Journal of Neuroscience_, posted corrections or expressions of concern on Wang papers, with some editors saying they were waiting for CUNY's investigation before taking further steps.

104.    On this news, the Company's stock price fell from $17.34 per share at the close of trading on October 12, 2023 to $14.86 per share at the close of trading on October 13, 2023, representing a $2.68 decline per share, or 15.28%.

## DAMAGES TO CASSAVA

105.    As a direct and proximate result of the Individual Defendants' misconduct, Cassava has lost and will continue to lose and expend many millions of dollars.

106.    Such losses include compensation paid to Individual Defendants pursuant to the Compensation Program.

107.    Such expenditures include, but are not limited to, the fees associated with the Securities Class Action filed against the Company and the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

108.    Additionally, these expenditures include, but are not limited to, unjust

compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

109.    As a direct and proximate result of the Individual Defendants' conduct, Cassava has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

110.    Plaintiffs bring this action derivatively and for the benefit of Cassava to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Cassava, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof.

111.    Cassava is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

112.    Plaintiffs are, and have been at all relevant times, shareholders of Cassava. Plaintiffs will adequately and fairly represent the interests of Cassava in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

113.    Plaintiffs incorporate by reference and reallege each and every allegation stated above as if fully set forth herein.

114.    A pre-suit demand on the Board of Cassava is futile and, therefore, excused. At the

time of filing of this action, the Board consists of the following nine individuals: Defendants Barbier, Barry, Gussin, O'Donnell, Robertson, and Scannon (the "Director-Defendants"), and nonparties Robert Anderson, Jr., Pierre Gravier, and Claude Nicaise (collectively with the Director-Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

115.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

116.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors during the Relevant Period. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

117.    Additional reasons that demand on Defendant Barbier is futile follow. Defendant Barbier has served as the Company's CEO, President, and Chairman of the Board since he founded the Company in May 1998. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Barbier with his principal occupation for which he receives substantial compensation. As CEO, President, and Chairman of the Board, Defendant Barbier was

ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the statements he personally made in numerous press releases during the Relevant Period and the statements in the 2022 10-K, which he signed both the document and the attached SOX certifications for. In addition, the 2023 Proxy Statement was solicited on his behalf, and the false and misleading statements contained therein contributed to shareholders approving, on an advisory basis, his unjust compensation and caused the re-election of Defendants Gussin and Barry to the Board, allowing them to continue to breach their fiduciary duties to the Company. As the Company's highest officer and as trusted Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Barbier is a defendant in the Securities Class Action. For these reasons, Defendant Barbier breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118.    Additional reasons that demand on Defendant Barry is futile follow. Defendant Barry has served as a Company director since June 2021. As a member of the Board, Defendant Barry serves as the Chair of the Audit Committee and of the Nominating and Governance Committee. Defendant Barry signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. Moreover, the 2023 Proxy Statement, which contained false and misleading statements, was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board and shareholders approving the Compensation Program. Such approvals allowed Defendant Barry to continue to breach his

fiduciary duties and to reap material benefits as the Compensation Program now entitles Defendant Barry to (1) a $10,000 annual retainer; (2) an initial nonqualified stock option grant for the right to purchase 20,000 shares of the Company's common stock; (3) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares of Company's common stock; and (4) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of the Company's common stock for service on one committee or 5,000 shares of the Company's common stock for service on two or more committees. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Barry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119. Additional reasons that demand on Defendant Gussin is futile follow. Defendant Gussin has served as a Company director since March 2003. He also serves as a member of both the Audit Committee and the Compensation Committee. Defendant Gussin signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. Moreover, the 2023 Proxy Statement, which contained false and misleading statements, was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board and shareholders approving the Compensation Program. Such approvals allowed Defendant Gussin continue to breach his fiduciary duties and to reap material benefits, as the Compensation Program now entitles Defendant Gussin to (1) a $10,000 annual retainer; (2) an initial nonqualified stock option grant for the right to purchase 20,000 shares of the Company's

common stock; (3) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares of Company's common stock; and (4) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of the Company's common stock for service on one committee or 5,000 shares of the Company's common stock for service on two or more committees. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gussin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

120. Additional reasons that demand on Defendant O'Donnell is futile follow. Defendant O'Donnell has served as a Company director since June 1998. Defendant O'Donnell signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. Moreover, the 2023 Proxy Statement, which contained false and misleading statements, was solicited on his behalf, and the false and misleading statements contained therein contributed to shareholders approving the Compensation Program and caused the re-election of Defendants Gussin and Barry to the Board, allowing them to continue to breach their fiduciary duties to the Company. Such approvals allowed Defendant O'Donnell to reap material benefits, as the Compensation Program now entitles Defendant O'Donnell to (1) a $10,000 annual retainer; (2) an initial nonqualified stock option grant for the right to purchase 20,000 shares of the Company's common stock; (3) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares of Company's common stock; and (4) an

additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of the Company's common stock for service on one committee or 5,000 shares of the Company's common stock for service on two or more committees. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant O'Donnell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121.     Additional reasons that demand on Defendant Robertson is futile follow. Defendant Robertson has served as a Company director since September 1998. He also serves as a member on each of the Audit Committee, the Compensation Committee, and Nominating and Governance Committee. In addition, he serves as Lead Director. Defendant Robertson signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. Moreover, the 2023 Proxy Statement was solicited on his behalf and the false and misleading statements contained therein contributed to shareholders approving the Compensation Program and caused the re-election of Defendants Gussin and Barry to the Board, allowing them to continue to breach their fiduciary duties to the Company. Such approvals allowed Defendant Robertson to reap material benefits, as the Compensation Program now entitles Defendant Robertson (1) a $10,000 annual retainer; (2) an initial nonqualified stock option grant for the right to purchase 20,000 shares of the Company's common stock; (3) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares of Company's common stock; and (4) an additional nonqualified stock option grant on the data of the Annual Meeting for

the right to purchase 2,500 shares of the Company's common stock for service on one committee or 5,000 shares of the Company's common stock for service on two or more committees. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Robertson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

122.    Additional reasons that demand on Defendant Scannon is futile follow. Defendant Scannon has served as a Company director since December 2007. During the Relevant Period, he served as a member of the Audit Committee. Defendant Scannon signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. Moreover, the 2023 Proxy Statement, which contained false and misleading statements, was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board and shareholders approving the Compensation Program. Such approvals allowed Defendant Scannon to continue to breach his fiduciary duties and to reap material benefits as the Compensation Program now entitles Defendant Scannon to (1) a $10,000 annual retainer; (2) an initial nonqualified stock option grant for the right to purchase 20,000 shares of the Company's common stock; (3) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares of Company's common stock; and (4) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of the Company's common stock for service on one committee or 5,000 shares of the Company's common stock for service on two or more committees. As a trusted Company director,

he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Scannon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

123. Additional reasons that demand on the Board is futile follow.

124. Director-Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon solicited shareholders in the 2023 Proxy Statement to approve the Compensation Plan, from which they each materially benefited and continue to benefit. Director-Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon each were well aware of and had access to non-public information regarding Cassava's research and the prevalent issues associated with it. If not for the false and misleading statements throughout the Relevant Period and for the false and misleading elements in the 2023 Proxy Statement, Cassava shareholders would not have voted to approve the Compensation Program and reelect Defendants Barry and Gussin to the Board. Accordingly, the Individual Defendants materially benefited as a result of the scheme to cause the Company to make false and misleading statements. Under the Compensation Program, Director-Defendants Barry, Gussin, O'Donnell, Robertson and Scannon are now entitled to (1) a $10,000 annual retainer; (2) an initial nonqualified stock option grant for the right to purchase 20,000 shares of the Company's common stock; (3) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares of Company's common stock; and (4) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of the Company's common stock for service on one committee or 5,000

shares of the Company's common stock for service on two or more committees. As a group, Director-Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon are collectively entitled to $150,000 and 245,000 in shares and options. Such awards provide material benefits to Director-Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon that render them incapable of evaluating a demand with disinterestedness. Thus, Director-Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon would be incapable of consider any demand challenging the Compensation Program or their own involvement in the scheme to cause the Company to issue materially false and misleading statements and related claims. As a result of the foregoing, Director-Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

125.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. In addition, Defendants Barbier, O'Donnell, and Robertson, have worked together at the Company for over two decades since they all joined in 1998, with Defendant Gussin working with them for almost that long having joined in 2003. Director-Defendant Scannon has also worked with Director-Defendants Barbier, O'Donnell, Robertson, and Gussin at the Company for over a decade, with Director-Defendant Scannon joining in 2007. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

126.    Director-Defendants Barry, Gussin, and Robertson (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to

the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for, *inter alia*, monitoring the Company's system of internal controls, reviewing their adequacy on an ongoing basis, and recommending to the Board remedies to any identified deficiencies. The Audit Committee Defendants failed to adequately oversee the Company's internal controls, failed to identify or remedy deficiencies with the Company's internal controls, and thus failed prevent the Company from issuing false and misleading statements to the public and the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

127.     Defendants Gussin and Robertson (the "Compensation Committee Defendants") served as members of the Compensation Committee during the Relevant Period. As stated in the 2023 Proxy Statement, "[t]he Compensation Committee reviews and recommends to the Board of Directors the salaries, incentive compensation and benefits of the Company's officers and administers the Company's stock plans and employee benefit plans." The Compensation Committee Defendants thus reviewed and recommended to the Board the salaries, incentive compensation and benefits of the Individual Defendants, and awarded them compensation under the Company's stock plans. This compensation was unjust in light of the Individual Defendants'—including the Compensation Committee Defendants'—violations of law. Thus, the Compensation Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

128.     In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross

mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to act with honesty and integrity; failed to provide the SEC and public with complete, fair, accurate, timely, and understandable disclosures; failed to comply with applicable laws and regulations; failed to act in good faith, responsibly with due care and diligence and without misrepresentation or omission of material facts; failed to promote ethical behavior at the Company; and failed to promptly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

129. Cassava has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Cassava any part of the damages Cassava suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

130. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

131. The acts complained of herein constitute violations of fiduciary duties owed by Cassava's officers and directors, and these acts are incapable of ratification.

132.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Cassava. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants or certain of the officers of Cassava, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

133.     If there is no directors' and officers' liability insurance, then the Directors will not cause Cassava to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

134.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

135.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

136.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

137.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

138.    Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose, *inter alia*: (1) contrary to the 2023 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements to the investing public, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder approval of Non-employee Director Compensation Program, which the Individual Defendants serving on the Compensation Committee were improperly administering by rewarding misconduct.

139. Additionally, the 2023 Proxy Statement further failed to disclose that: (1) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) the Company's data control failures made the data that supported simufilam's efficacy susceptible to manipulation and had overstated the effectiveness of the drug; (3) as a result of manipulated data, the Company had misrepresented to the investing public the efficacy of its simufilam trials and the clinical and/or commercial prospects of simufilam; (4) the Company was subjected to heightened risks as a result of the substantial financial and reputational harm that would result from the foregoing being revealed; (5) the Company failed to maintain adequate internal controls; and (6) as a result, the Company's public statements were materially false and misleading at all times.

140. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement was materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the reelection of Defendants Barry and Gussin to the Board; approving the Compensation Program; ratifying EY as independent auditor the 2023 Fiscal Year; and the approval, on an advisory basis, of Defendants Barbier's and Schoen's compensation.

141. The false and misleading elements of the 2023 Proxy Statement led to, among other things, the reelection of the Defendants Barry and Gussin, which allowed them to continue to breach their fiduciary duties to the Company. The false and misleading elements of the 2023 Proxy Statement also led the Company's shareholders to approve, on an advisory basis, Defendants Barbier's, and Schoen's compensation. In addition, the false and misleading elements of the 2023

Proxy Statement resulted in the breaching non-employee Directors, namely Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon, in being compensated by the Company.

142.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

143.    Plaintiffs, on behalf of Cassava, have no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

144.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

145.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Cassava's business and affairs.

146.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

147.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Cassava.

148.    In breach of their fiduciary duties owed to Cassava, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) the Company's data control failures made the data that supported simufilam's efficacy susceptible to manipulation and had overstated the effectiveness of the drug;

(3) as a result of manipulated data, the Company had misrepresented to the investing public the efficacy of its simufilam trials and the clinical and/or commercial prospects of simufilam; (4) the Company was subjected to heightened risks as a result of the substantial financial and reputational harm that would result from the foregoing being revealed; (5) the Company failed to maintain adequate internal controls; and (6) as a result, the Company's public statements were materially false and misleading at all times.

149.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

150.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

151.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Cassava's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

152.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

153. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Cassava has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

154. Plaintiffs on behalf of Cassava have no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Unjust Enrichment**

155. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

156. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Cassava.

157. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Cassava that was tied to the performance or artificially inflated valuation of Cassava, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes compensation received under the Compensation Program, which certain Individual Defendants induced the Company's shareholders to approve through false and misleading representations.

158. Plaintiffs, as shareholders and representatives of Cassava, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, payments to the Individual Defendants under the Compensation Program, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

159. Plaintiffs on behalf of Cassava have no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

160.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

161.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Cassava, for which they are legally responsible.

162.     As a direct and proximate result of the Individual Defendants' abuse of control, Cassava has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

163.     Plaintiffs on behalf of Cassava have no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

164.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

165.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Cassava in a manner consistent with the operations of a publicly-held corporation.

166.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Cassava has sustained and will continue to sustain significant damages.

167.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

168.     Plaintiffs on behalf of Cassava have no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

169.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

170.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

171.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Cassava to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

172.    As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

173.    Plaintiffs on behalf of Cassava have no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Barbier and Schoen for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

174.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

175.    Cassava, Defendant Barbier and Defendant Schoen are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants

Barbier's and Schoen's willful and/or reckless violations of their obligations as officers and/or director of Cassava.

176.    Defendants Barbier and Schoen, because of their positions of control and authority as CEO and Chairman, and CFO, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Cassava, including the wrongful acts complained of herein and in the Securities Class Action.

177.    Accordingly, Defendants Barbier and Schoen are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

178.    As such, Cassava is entitled to receive all appropriate contribution or indemnification from Defendants Barbier and Schoen.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Cassava, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Cassava;

(c)    Determining and awarding to Cassava the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Cassava and the Individual Defendants to take all necessary

Case: 1:24-cv-02223 Document #: 1 Filed: 03/18/24 Page 56 of 57 PageID #:56

actions to reform and improve Cassava's corporate governance and internal procedures to comply with applicable laws and to protect Cassava and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

> 2. a provision to permit the shareholders of Cassava to nominate at least five candidates for election to the Board;

> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Cassava restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

March 18, 2024

Respectfully Submitted,

**THE BROWN LAW FIRM, P.C.**

/s/_____*Timothy Brown*_____
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net