**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE CASSAVA SCIENCES, INC. DERIVATIVE LITIGATION | Lead Case No.: 1:24-cv-02223 |
| | **DEMAND FOR JURY TRIAL** |

## AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiffs Guillermo Marti, Felicia Marti, and Jose Garza ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of Nominal Defendant Cassava Sciences, Inc. ("Cassava" or the "Company"), file this Amended Verified Shareholder Derivative Complaint against Remi Barbier ("Barbier"), Richard Jon Barry ("Barry"), Lindsay Burns ("Burns"), James W. Kupiec ("Kupiec"), Eric Schoen ("Schoen"), Robert Anderson, Jr. ("Anderson"), Pierre Gravier ("Gravier"), Robert Z. Gussin ("Gussin"), Claude Nicaise ("Nicaise"), Michael J. O'Donnell ("O'Donnell"), and Patrick J. Scannon ("Scannon"), (collectively, the "Individual Defendants" and with Cassava, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Cassava, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution against Defendants Barbier, Barry, Burns, Kupiec, and Schoen under Sections 10(b) and 21D of the Exchange Act. As for Plaintiffs' Amended Complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based

1

upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cassava, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Cassava's directors and officers from October 12, 2023 to March 25, 2025, both dates inclusive (the "Relevant Period").

2.      Cassava is a Delaware biotechnology corporation based in Austin, Texas, which develops drugs for neurodegenerative diseases. Its lead therapeutic product candidate is "simufilam" which is intended to treat Alzheimer's Disease ("Alzheimer's," or the "Disease"). Simufilam is designed to target a protein in the brain, filamin A ("FLNA"), and revert it to a healthy conformation, combatting the effects of altered FLNA, and combat the progression of Alzheimer's disease.

3.      Prior to the Relevant Period, the Company, then called Pain Therapeutics, Inc., completed a Phase 1 clinical study (the "Phase 1 Study") for simufilam and two Phase 2 clinical trial programs, a Phase 2a study (the "Phase 2a Study"), and a Phase 2b study (the "Phase 2b Study"). The Company also began a third Phase 2 trial (the "Phase 2 Study") that concluded during the Relevant Period and which utilized a larger patient population and longer duration than previous studies.

4.     The Phase 2b Study became embroiled in controversy in August of 2021, when Dr. Hoau-Yan Wang ("Dr. Wang") of the City University of New York ("CUNY"), Cassava's longstanding consultant responsible for testing the final analyses of cerebrospinal fluid for the Phase 2b Study, was accused of serious research malfeasance and data manipulation in a citizen petition.

5.     Throughout the ensuing years, the Individual Defendants made and/or caused the Company to make numerous materially false and/or misleading statements related to the misconduct alleged with respect to the Phase 2b Study. Even in the face of government investigations into the misconduct, the Individual Defendants caused the Company to continue to falsely assure investors that the allegations at the heart of those investigations were unfounded, and continued to boast of the positive results of the Phase 2b Study. This pattern of deceptive behavior continued even after Dr. Wang was ultimately indicted for falsifying data to fraudulently obtain grants for Cassava from the National Institute of Health (the "NIH").

6.     The Relevant Period begins on October 12, 2023, the day of the leak of a report about CUNY's internal investigation into Dr. Wang's alleged misconduct. Specifically, this report described an internal investigation into all ***thirty-one allegations of research misconduct by Dr. Wang*** and concluded that there existed "evidence highly suggestive of deliberate scientific misconduct by Dr. Wang for 14 of the 31 allegations," including but not limited to, "image aberrations that may be consistent with the fabrication/manipulation of the data." The report also implicated Defendant Burns, stating that she also bore responsibility for some of the alleged misconduct.

7.     Subsequent filings with the SEC and statements to the investing public continuously downplayed the seriousness of the investigations, which were continuing, stating that

3

no "government agency has informed the Company that it has found evidence of research misconduct or wrongdoing by the Company or its officers, employees, or directors."

8.      However, the Individual Defendants knew, or should have known, absent extreme recklessness, that even while leading investors to believe the Company was successfully testing a pioneering drug for fighting Alzheimer's, more than a year before, the Company had audited Dr. Wang's CUNY laboratory related to his Phase 2b Study work, and found that it "was unacceptable and temporarily not qualified to provide biomarker analysis and research services for *any future Cassava studies*."

9.      Simultaneously, the Company continued to boast of thepromising results of the Phase 2b Study, including simufilam's "[e]ncouraging effects on cognition," and "improvements in CSF [(cerebrospinal fluid)] biomarkers of disease pathology, neurodegeneration, and neuroinflammation," and "improvements in validated tests of episodic memory and spatial working memory" versus patients on a placebo.

10.     Throughout the Relevant Period, Defendants repeatedly touted their belief in the effectiveness of simufilam and its potential for commercial success. For instance, during an earnings call on August 8, 2024, Defendant Kupiec stated of the topline results from the Phase 2 Study that he "*was excited when [he] joined Cassava, but [that he was] even more excited and optimistic now about simufilam and its chance of success in Phase 3*."[1]

11.     However, these representations failed to disclose, *inter alia*, that the information regarding simufilam's effectiveness was unreliable and that, in reality, simufilam would be incapable of hindering the progression of Alzheimer's Disease even in mild cases.

12.     Despite representing that the Phase 2 Study produced results supporting a finding

---

[1] All emphasis herein is added unless stated otherwise.

of "No Decline in Cognition Scores in Patients with mild Alzheimer's Disease Who Received Simufilam Continuously for 24 Months," the Phase 2 Study in fact had several fatal flaws. To begin, the results of the Phase 2 Study were based on analyses of only approximately half of the intent-to-treat ("ITT") population—all randomized patients, regardless of treatment. The ITT population was 219 patients; however, although the Company reported that the Phase 2 Study results were based on the Full Analysis Set (the "FAS"), the announced results, in reality, were only based on those patients that had completed cognition testing at the baseline test and at the end of the trial. Patients unavailable for cognition assessment at the conclusion of the trial, and those who dropped out of the trial, were excluded. This constitutes a violation of the ICH E9 Statistical Principles for Clinical Trials (the "E9 Principles"), which provides guidance for the analysis of clinical trials, and which constitute official policy for the United States Food and Drug Administration (the "FDA"). The E9 Principles prohibit excluding patients that discontinued participation in a given trial. Additionally, patients taking simufilam did not show any consistent improvement relative to those given a placebo. Finally, the Phase 2 Study was conducted without the Company alerting investors that a substantial change to the more rigorous ITT analysis in Phase 3 testing was imminent, rendering the Phase 2 Study a poor predictor of Phase 3 performance. The results, despite the Individual Defendants' assertions, were inconclusive, at best.

13. The truth about the Phase 2b Study and Phase 2 Study began to emerge on June 28, 2024, when Dr. Wang was indicted for his misconduct with respect to his work on the Phase 2b Study.

14. On this news, the price per share of the Company's common stock fell by $6.60, or approximately 34.8%, from a closing price of $18.95 on June 27, 2024, to close at $12.35 on June 28, 2024.

15.     The truth continued to emerge with respect to the efficacy of simufilam on November 25, 2024, when the Company revealed that the first of the Phase 3 clinical trials, named RETHINK-ALZ, had failed, and that the Company would be discontinuing the second Phase 3 clinical trial, REFOCUS-ALZ.

16.     However, it was not until March 25, 2025, that the full truth emerged. On that date, the Company announced that simufilam, Cassava's only prospective drug product, had failed to meet any endpoints for the second Phase 3 clinical trial (REFOCUS-ALZ), and that the Company was entirely discontinuing its development of simufilam for the treatment of Alzheimer's.

17.     On this news, the price per share of the Company's common stock fell by $0.90, or approximately 32.1%, from a close of $2.80 on March 24, 2025, to $1.90 on March 25, 2025.

18.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's own internal investigation had determined that Dr. Wang's laboratory "was unacceptable and temporarily not qualified" to provide Cassava *any* research services; (2) as a result of Dr. Wang's work with Defendant Burns, the United States Department of Justice (the "DOJ") and SEC were investigating Cassava, Defendant Burns, and Defendant Barbier; (3) the departures of Defendants Burns and Barbier was directly caused by that investigation; (4) as a result of the foregoing, the information regarding simufilam's effectiveness was unreliable; (5) the unadulterated data from simufilam's Phase 2 Study did not evidence the drug's potential as an effective Alzheimer's treatment; (6) simufilam's Phase 3 study would yield similarly unimpressive

results concerning the drug's effectiveness; (7) simufilam would be incapable of hindering the progression of Alzheimer's Disease even in mild to moderate cases; (8) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; and (9) the Company failed to maintain adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

19.     Moreover, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

20.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its former CEO, its former Chief Medical Officer ("CMO"), its former Senior Vice President of Neuroscience, and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Western District of Texas, Austin Division (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

21.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

22.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants,

most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of the liability of Defendants Barbier, Barry, Burns, Kupiec, and Schoen in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

24.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

25.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

8

27.     Plaintiffs are current shareholders of Cassava. Plaintiffs have continuously held Cassava stock at all relevant times.

**Nominal Defendant Cassava**

28.     Cassava is a Delaware corporation with its principal executive offices at 6801 N. Capital of Texas Highway, Building 1, Suite 300, Austin, Texas 78731. Cassava's shares trade on the Nasdaq Capital Market ("Nasdaq") under the ticker symbol "SAVA."

**Defendant Barbier**

29.     Defendant Barbier is the Company's founder and served as its President, CEO, and Chairman of the Board from 1998 to July 15, 2024. Additionally, Defendant Barbier served as a Company director from 1998 to September 13, 2024.

30.     The proxy statement which the Company filed on Schedule 14A with the SEC on March 26, 224 (the "2024 Proxy Statement") stated the following about Defendant Barbier:

> Remi Barbier, the Company's founder, has served as President, Chief Executive Officer and Chairman of the Board of Directors since the Company's inception in 1998. Prior to that time, Mr. Barbier helped in the growth or founding of Exelixis Inc., a publicly-traded drug development company, ArQule, Inc., a drug development company acquired by Merck & Co., and EnzyMed, Inc., a chemistry company acquired by Albany Molecular Research, Inc. Mr. Barbier is a trustee emeritus of the Carnegie Institute of Washington, the Santa Fe Institute, the Advisory Board of the University of California Institute for Quantitative Biosciences and advises a life science incubator at the University of Arkansas for Medical Sciences. Mr. Barbier received his B.A. from Oberlin College and his M.B.A. from the University of Chicago.

**Defendant Barry**

31.     Defendant Barry has served as a Company director since June 2021 and has served as the Company's CEO since September 2024. Additionally, Defendant Barry served as Executive Chairman of the Board from July 2024 to September 2024 and as the Chairman of the Audit Committee and the Chairman of the Nominating and Corporate Governance Committee during the Relevant Period.

32.     The proxy statement which the Company filed on Schedule 14A with the SEC on

April 14, 2025 (the "2025 Proxy Statement") stated the following about Defendant Barry:

> *Richard (Rick) Barry* has served as a Director since June 2021 and was appointed
> Chief Executive Officer in September 2024. Mr. Barry served as Executive
> Chairman of the Board beginning July 2024 until his appointment as Chief
> Executive Officer. Since June 2015, Mr. Barry has also served as Director of
> Sarepta Therapeutics, Inc., (Nasdaq: SRPT). Mr. Barry has extensive experience in
> the investment management business. He was a founding member of Eastbourne
> Capital Management LLC, and served as a Managing General Partner and Portfolio
> Manager from 1999 to its close in 2010. Prior to Eastbourne, Mr. Barry was a
> Portfolio Manager and Managing Director of Robertson Stephens Investment
> Management. Mr. Barry holds a Bachelor of Arts from Pennsylvania State
> University.

**<u>Defendant Burns</u>**

33.     Defendant Burns served as the Company's Senior Vice President of Neuroscience

from prior to the start of the Relevant Period until July 16, 2024.

**<u>Defendant Kupiec</u>**

34.     Defendant Kupiec served as the Company's CMO from December 2022 until he

retired in May 2025.

35.     The 2025 Proxy Statement stated the following about Defendant Kupiec:

> *James W. Kupiec,* M.D. has served as our Chief Medical Officer since December
> 2022 and previously served as our Chief Clinical Development Officer from
> January 2021 to December 2022. Dr. Kupiec joined the Company after three
> decades of drug development experience at Pfizer, Sanofi and Ciba-Geigy. Dr.
> Kupiec previously served as Vice President, Global Clinical Leader for Parkinson's
> Disease and Clinical Head of the Neuroscience Research Unit for Pfizer, Inc., in
> Cambridge, MA. He joined Pfizer in 2000 after seven years with Sanofi, and two
> years with Ciba-Geigy Pharmaceuticals. During his 17-year career at Pfizer, Dr.
> Kupiec had extensive governance, business development, alliance and leadership
> responsibilities. Dr. Kupiec earned his BS with Honors in Biochemistry at Stony
> Brook University and his MD from the Albert Einstein College of Medicine. He
> completed his residency training at the Strong Memorial Hospital, University of
> Rochester School of Medicine, and is certified by the American Board of Internal
> Medicine. He served as an investigator on many clinical trials before joining the
> pharmaceutical industry.

**<u>Defendant Schoen</u>**

36. Defendant Schoen has served as the Company's CFO since 2018.

37. The 2025 Proxy Statement stated the following about Defendant Schoen:

*Eric Schoen* has served as Chief Financial Officer since 2018. Prior to joining the Company, Mr. Schoen served in numerous financial leadership roles. Most recently, he served as Vice President, Senior Vice President, Finance and Chief Accounting Officer of Aspira Women's Health Inc. (formerly Vermillion, Inc.), a publicly-held women's health company, from 2011 to 2017. Mr. Schoen also began his career and spent nine years with PricewaterhouseCoopers in the audit and assurance, transaction services and global capital markets practices. Mr. Schoen received his B.S. in Finance from Santa Clara University.

**Defendant Anderson**

38. Defendant Anderson has served as a Company director since December 2023. He also serves as Chair of the Nominating and Governance Committee and as a member of the Audit Committee.

39. The 2025 Proxy Statement stated the following about Defendant Anderson:

*Robert Anderson, Jr.* has served as a director since December 2023. Mr. Anderson has decades of operational experience in cybersecurity, counterintelligence, economic espionage and critical incident response and management. Mr. Anderson previously led more than 20,000 FBI employees as the bureau's Executive Assistant Director of the Criminal, Cyber, Response and Services Branch— the No. 3 position in the organization. From January 2025 until March 2025, Mr. Anderson was a managing partner at Oak Truss Group (formerly Cyber Defense Labs), an advisory firm focused on cybersecurity, where he served as Chief Executive Officer (March 2019 – December 2024) and Chairman of the Board (January 2022 – December 2024). Mr. Anderson holds a Bachelor of Science and a Master in Public Administration from Wilmington University.

**Defendant Gravier**

40. Defendant Gravier has served as a Company director since December 2023. He also serves as Chair of the Audit Committee.

41. The 2025 Proxy Statement stated the following about Defendant Gravier:

*Pierre Gravier* has served as a director since December 2023. Since July 2023, Mr. Gravier has been the Chief Financial Officer of PTC Therapeutics, Inc., a publicly traded biotechnology company. From 2013 to July 2023, Mr. Gravier was previously Managing Director in the healthcare group of Perella Weinberg

Partners, a leading global independent advisory firm that provides strategic, financial, and tactical advice in connection with executing mergers, acquisitions and other corporate strategies. Mr. Gravier holds a Master's Degree in Finance from ESCP Business School and a Master of Science in Bioengineering from the University of Technology of Compiègne.

**Defendant Gussin**

42.     Defendant Gussin has served as a Company director since 2003. He also serves as

a member of the Audit Committee and as a member of the Compensation Committee.

43.     The 2025 Proxy Statement stated the following about Defendant Gussin:

*Robert Z. Gussin, Ph.D.* has served as a director since 2003. Dr. Gussin worked at Johnson & Johnson for 26 years, most recently as Chief Scientific Officer and Corporate Vice President, Science and Technology from 1986 through his retirement in 2000. Dr. Gussin served on the board of directors of Duquesne University and the advisory boards of the Duquesne University Pharmacy School and the University of Michigan Medical School Department of Pharmacology. Dr. Gussin received his B.S. and M.S. degrees and D.Sc. with honors from Duquesne University and his Ph.D. in Pharmacology from the University of Michigan, Ann Arbor.

**Defendant Nicaise**

44.     Defendant Nicaise has served as a Company director since December 2023 and as

Chairman of the Board since September 2024. He also serves as Chair of the Compensation

Committee and as a member of the Nominating and Governance Committee.

45.     The 2025 Proxy Statement stated the following about Defendant Nicaise:

*Claude Nicaise, M.D.* has served as a director since December 2023. Since June 2015, Dr. Nicaise has also served as a director of Sarepta Therapeutics, Inc., (Nasdaq: SRPT). Since January 2021, Dr. Nicaise has served as a member of the board of directors of Gain Therapeutics. Since March 2021, Dr. Nicaise has served as a member of the board of directors of Chemomab Therapeutics Ltd. Dr. Nicaise has held clinical/regulatory leadership roles that have resulted in 14 new drug approvals in various diseases areas, including neuroscience. Dr. Nicaise is the founder of Clinical Regulatory Services, a company providing advice on clinical and regulatory matters to biotechnology companies. Dr. Nicaise served as Executive Vice President, Regulatory at Ovid Therapeutics Inc., a company that develops medicines for orphan diseases of the brain, from 2015 to March 2023. Dr. Nicaise was a Senior Vice President of Strategic Development and Global Regulatory Affairs at Alexion Pharmaceuticals from 2008 to 2014. From 1983 to

2008, Dr. Nicaise served in various positions of increasing responsibility at Bristol-Myers Squibb, including senior positions such as Vice President of Global Development and Vice-President of Worldwide Regulatory Science and Strategy. Dr. Nicaise received his M.D. from the Université Libre de Bruxelles in Belgium.

**Defendant O'Donnell**

46. Defendant O'Donnell has served as a Company director since 1998.

47. The 2025 Proxy Statement stated the following about Defendant O'Donnell:

*Michael J. O'Donnell, Esq.* has served as a director since 1998. Mr. O'Donnell has been a partner in the law firm of Orrick, Herrington & Sutcliffe LLP since June 2021. Orrick, Herrington & Sutcliffe LLP has provided legal services to the Company. Previously, Mr. O'Donnell was a member of Morrison & Foerster LLP from 2011 to 2021. Mr. O'Donnell serves as corporate counsel to numerous public and private biopharmaceutical and life sciences companies. Previously, Mr. O'Donnell was a member of Wilson Sonsini Goodrich & Rosati. Mr. O'Donnell received his J.D., cum laude, from Harvard University and his B.A. from Bucknell University, summa cum laude.

**Defendant Scannon**

48. Defendant Scannon has served as a Company director since 2007.

49. The 2025 Proxy Statement stated the following about Defendant Scannon:

*Patrick J. Scannon, M.D., Ph.D.* has served as a director since 2007. Dr. Scannon is one of the founders of XOMA. From 2006 to 2016, Dr. Scannon was Executive Vice President, Chief Biotechnology Officer of XOMA. From 1993 to 2006, Dr. Scannon served as Chief Scientific and Medical Officer of XOMA. Dr. Scannon retired from XOMA and resigned from XOMA's board of directors in 2016. Dr. Scannon received his Ph.D. in organic chemistry from the University of California, Berkeley and his M.D. from the Medical College of Georgia.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

46. By reason of their positions as officers, directors, and/or fiduciaries of Cassava and because of their ability to control the business and corporate affairs of Cassava, the Individual Defendants owed Cassava and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Cassava in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to

13

act in furtherance of the best interests of Cassava and its shareholders so as to benefit all shareholders equally.

47.     Each director and officer of the Company owes to Cassava and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

48.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cassava, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

49.     To discharge their duties, the officers and directors of Cassava were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

50.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Cassava, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also the officers and directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised a majority of Cassava's Board at all relevant times.

51.     As the senior executive officers and/or directors of a publicly-traded company

whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Amended Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

52.     To discharge their duties, the officers and directors of Cassava were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Cassava were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Cassava's Code of Ethics (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Cassava conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or

practices;

       (d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Cassava and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

       (e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Cassava's operations would comply with all applicable laws and Cassava's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

       (f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

       (g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

       (h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

     53.     Each of the Individual Defendants further owed to Cassava and the shareholders the duty of loyalty requiring that each favor Cassava's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

     54.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Cassava and were at all times acting within the course and scope of such agency.

55.     Because of their advisory, executive, managerial, directorial, and controlling positions with Cassava, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

50.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Cassava.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

51.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

53.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and

individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Cassava was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

55.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Cassava and was at all times acting within the course and scope of such agency.

## CASSAVA'S CODE OF ETHICS

56.     Cassava's Code of Ethics states that it "embodies principles to which all directors, officers and employees are expected to adhere and advocate." The Code of Ethics further states that "all directors, officers and employees of the Company shall, to the best of their knowledge and ability, adhere to, comply with and advocate the principles set out in this code of ethics (the 'Code') governing their professional and ethical conduct in the fulfillment of their responsibilities."

57.     The Code of Ethics states that its purposes are to:

• Promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

• Promote full, fair, accurate, timely and understandable disclosure in reports and

18

documents that the Company files with, or submits to the U.S. Securities and Exchange Commission and in other public communications made by the Company;

• Promote compliance with applicable governmental laws, rules and regulations;

• Promote the prompt internal reporting of violations of the Code to appropriate persons of authority within the Company; and

• Promote accountability for adherence to the Code.

58.    The Code of Ethics also states that "[a]ll directors, officers and employees of the

Company will," *inter alia*:

> Act with honesty and integrity, avoiding actual or apparent conflicts between personal and the interests of the Company, including refraining from receiving improper personal benefits as a result of holding a particular position with the Company;
>
> ***
>
> Where applicable, provide the U.S. Securities and Exchange Commission (the "Commission") and the public with complete, fair, accurate, timely and understandable disclosure in periodic reports and other documents filed or submitted to the Commission and in other public communications;
>
> ***
>
> Endeavor to comply with applicable laws and regulations of federal, state, local and foreign governments and government agencies having jurisdiction over the Company, and with applicable regulations of private or self-regulatory authorities having jurisdiction over the Company;
>
> ***
>
> Act in good faith, responsibly with due care and diligence and without misrepresentation or omission of material facts and strive to maintain independent judgment in the performance and fulfillment of their duties and responsibilities;
>
> ***
>
> Promote ethical behavior among subordinates and peers at the Company;
>
> ***
>
> Not fraudulently influence, coerce, manipulate, mislead or fail to disclose relevant information to any auditor engaged in the performance of an audit for the purpose

of rendering the financial statements materially misleading.

\*\*\*

Comply with other policies and procedures of the Company applicable to their positions and employment, including the Company's Insider Trading Policy and, to the extent applicable, the other policies and procedures of the Company set forth in the Company's Employee Handbook.

59.     The Code of Ethics further notes that "[o]nly the Company's Board of Directors (the 'Board') is authorized to permit a waiver of this Code of Ethics." Additionally, the Company's Code of Ethics states that "[i]t is the duty of each director, officer and employee of the Company to report violations of the Code promptly to the attention of the Company's Chief Executive Officer, Chief Financial Officer or to any member of the Audit Committee of the Board."

60.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and unjust enrichment. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Cassava's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## CASSAVA'S AUDIT COMMITTEE CHARTER

61.     The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). Under the heading "Purposes," the Audit Committee Charter states the following, in relevant part:

The purpose of the Audit Committee of the Board of Directors of Cassava Sciences,

Inc., a Delaware corporation (the "Company"), shall be to make such examinations as are necessary to monitor the Company's system of internal controls, to provide the Company's Board of Directors with the results of its examinations and recommendations derived therefrom, to outline to the Board of Directors improvements made, or to be made, in internal accounting controls, to nominate independent auditors and to provide to the Board of Directors such additional information and materials as it may deem necessary to make the Board of Directors aware of significant financial matters which require the Board of Director's attention.

62.     Under the heading "Responsibilities," the Audit Committee Charter states the

following:

1.  Reviewing on a continuing basis the adequacy of the Company's system of internal controls;

2.  Reviewing on a continuing basis the activities, organizational structure and qualifications of the Company's internal audit function;

3.  Reviewing the independent auditors' proposed audit scope, approach and independence;

4.  Conducting a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors;

5.  Reviewing the performance of the independent auditors, who shall be accountable to the Board of Directors and the Audit Committee;

6.  Recommending the appointment of independent auditors to the Board of Directors;

7.  Reviewing fee arrangements with the independent auditors;

8.  Reviewing before release the audited financial statements and Management's Discussion and Analysis in the Company's annual report on Form 10-K;

9.  Reviewing before release the unaudited quarterly operating results in the Company's quarterly earnings release;

10. Overseeing compliance with the requirements of the Securities and Exchange Commission for disclosure of independent auditor's services and audit committee members and activities;

11. Overseeing of compliance with the Company's Standards of Business Conduct and with the Foreign Corrupt Practices Act;

12. Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;

13. Providing oversight and review of the Company's asset management policies, including an annual review of the Company's investment policies and performance for cash and short-term investments;

14. If necessary, instituting special investigations and, if appropriate, hiring special counsel or experts to assist;

15. Reviewing related party transactions for potential conflicts of interest;

16. Providing a report in the Company's proxy statement in accordance with the requirements of Item 306 of Regulations S-K and S-B and Item 7(e)(3) of Schedule 14A; and

17. Performing other oversight functions as requested by the full Board of Directors.

63.     In violation of the Audit Committee Charter, the Individual Defendants failed to adequately review and discuss the Company's annual and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

64.     Cassava is a biotechnology company that has a product portfolio including simufilam, its lead therapeutic product candidate, and SavaDx, its lead investigational diagnostic product candidate. Simufilam was originally developed as an Alzheimer's treatment, prior to the events at the heart of this Amended Complaint, and SavaDx is a test to detect the presence of Alzheimer's before the appearance of clinical symptoms. At all relevant times, simufilam was the Company's only drug candidate.

65.     Defendant Barbier founded the Company, which until 2019 operated under the

name Pain Therapeutics, Inc., and served as its President, CEO, and Chairman of the Board from that time until his resignation in July 2024. Under Barbier's management, the Company was sued over claims made with respect to the Company's prior leading drug candidate, REMOXY, an allegedly abuse-deterring form of oxycodone for chronic pain treatment. That suit alleged the Company, Barbier, and other previous executives engaged in securities fraud in misleading investors about the ability of the Company to obtain FDA approval for REMOXY, concealing material facts about the drug that would have alerted investors as to how likely the FDA's rejection of REMOXY really was. That case ultimately settled just prior to trial after the Court denied the defendants' motion for summary judgment.

### The Company Begins Researching Alzheimer's Disease Treatments

66.     Following the Company's legal woes pertaining to REMOXY, as well as the FDA's rejection thereof after four failed attempts at approval, it changed its name to Cassava and turned its focus to the development of Alzheimer's disease treatments.

67.     Alzheimer's is a degenerative brain disease that impairs cognition, overall brain function, and behavior, serving as the most common cause of dementia. The disease progresses from a mild stage to a moderate stage, eventually culminating in severe Alzheimer's. As the Disease progresses, cognitive decline becomes increasingly pronounced, and efforts at treatment become increasingly ineffective. An annual report by the Alzheimer's Association released in 2025 estimates that 7.2 million Americans age sixty-five and older suffer from Alzheimer's dementia, which is dementia believed to be caused by Alzheimer's based on clinical symptoms.

68.     Prior to the Relevant Period, the Company began development of a novel small molecule oral drug candidate to treat Alzheimer's and other neurological disorders. This drug candidate was simufilam. Simufilam targets an altered form of a protein found in the brain, known

as FLNA. FLNA is found in high levels in the brain and an altered form of the FLNA protein is found in brains of those afflicted by Alzheimer's. Cassava's experimental evidence suggested that altered FLNA contributes to the Disease's progression by disrupting normal neuron function, leading to neurodegeneration and brain inflammation. Simufilam was thus designed to counter the altered FLNA protein and thus restore its normal function. During the Relevant Period, simufilam was the Company's only therapeutic drug candidate.

69.     The science ostensibly supporting simufilam was originally published in *The Journal of Neuroscience* in a July 2012 article authored by, among others, Dr. Wang, Cassava's primary scientific consultant, and Defendant Burns. In 2015, the Company began preclinical trials for simufilam after the NIH's National Institute on Aging awarded Cassava a grant. The Company completed those trials in 2017 and submitted an Investigational New Drug ("IND") application, which was ultimately accepted, enabling development to progress. Subsequently, in October 2017, the Company completed a Phase 1 clinical study on simufilam, which investigated the compound's safety, dosing, and pharmacokinetic profile in healthy human volunteers. In 2018, the Company began a Phase 2 clinical program in patients suffering from the Disease.

70.     The Phase 2 clinical program included three studies. The first was a small, clinical proof-of-concept, open-label Phase 2a Study in 2019. This study included 13 patients over the span of 28 days, and suggested improvements in certain key biomarkers of the Disease's pathology, neurodegeneration, and neuroinflammation, after treatment for 28 days. Biomarker effects were seen in all patients in both blood plasma and cerebrospinal fluid. The Company was quick to boast that no other candidate drug had achieved improvement of a full panel of biomarkers in Alzheimer's patients before.

71.     The second study was the Phase 2b Study, a confirmatory, randomized, placebo-

24

controlled study in March 2020, which included 64 patients over a 28-day period. The Company announced the results of the Phase 2b Study in September 2020, with initial reports suggesting that patients treated with 50mg or 100mg of simufilam twice a day showed statistically significant improvements in cerebrospinal fluid biomarkers of Disease pathology, neurodegeneration, and neuroinflammation. The Company claimed that these results showed improvements in validated tests of episodic memory and spatial working memory as compared to those who were given a placebo. However, the results of this study were subsequently called into question because of allegations of data manipulation and research misconduct by Dr. Wang.

72.    The third study was the Phase 2 Study, which sought, despite the questionable lab results from the Phase 2b Study, to evaluate simufilam in patients with the Disease in March 2020. The Phase 2 Study originally intended to monitor long-term safety and tolerability of simufilam 100mg twice a day for twelve months in an intended population. This study was, however, subsequently revised. As implemented, the Phase 2 Study consisted of a six-month randomized withdrawal period followed by a six-month open-label period, with an intended population of 200 patients. The Phase 2 Study used the Alzheimer's Disease Scale-Cognitive Subscale ("ADAS-Cog") to measure changes in cognition and the Neuropsychiatric Inventory ("NPI") to assess dementia-related behavior. Both are standard clinical tools in Disease trials. The Phase 2 Study ultimately included 219 patients and lasted twenty-four months, finishing in November 2023. During this time, on February 22, 2021, the Company announced the completion of an End-of-Phase 2 meeting with the FDA, during which the Company and FDA had agreed on key elements of a Phase 3 clinical program in support of the New Drug Application ("NDA") filing for simufilam for use as an Alzheimer's treatment

73.    The Company announced the results of the Phase 2 Study in February 2024, but

failed to publish the full results of the study on ClinicalTrials.gov for a year, waiting until February 12, 2025.

74.     The FDA and the Company agreed that the co-primary endpoints of efficacy for simufilam would be separate clinical scales assessing cognition according to the ADAS-Cog, and function, according to the Alzheimer's Disease Cooperative Study – Activities of Daily Living subscale ("ADCS-ADL"). A secondary efficacy endpoint was to be a clinical scale that combined cognition and function, such as the integrated Alzheimer's Disease Rating Scale (the "IADR"). On August 24, 2021, Cassava reached an agreement with the FDA under Special Protocol Assessment for the Phase 3 clinical trial program. The FDA concurred with the adequacy and acceptability of specific critical elements of the protocol design, including entry criteria, dose selection and endpoints, which ensure the studies can be considered adequate and well-controlled in support of any future regulatory submission and/or marketing application.

### *Investigations into the Research Misconduct Commence as Cassava Attempts to Deny and Deflect Mounting Scrutiny*

75.     On August 24, 2021, after the close of trading, reports emerged that the FDA was in receipt of a petition requesting that it halt any future Phase 3 trials of simufilam pending an audit of the current clinical trials. The petition centered on concerns about the data and analysis of that data in the foundational research papers authored by Dr. Wang and Defendant Burns, which the Company used to obtain both NIH grants and IND applications to study simufilam. The petition alleged anomalies existed in images of tests known as western blots, a common laboratory technique for detecting proteins in blood and tissue samples, which were indicative of data manipulation. The petition further questioned clinical biomarker data from the Phase 2b Study, particularly the fact that the cerebrospinal fluid samples therefrom were first analyzed by an outside lab that found that simufilam was *ineffective* in improving the primary biomarkers

endpoint.

76.    On August 30, 2021, the petition was supplemented by documents revealing that re-analysis of the cerebrospinal fluid samples conducted by Dr. Wang during the Phase 2b Study were all the more questionable because Dr. Wang had a financial interest in the success of simufilam. The petition was further supplemented on September 9, 2021, November 17, 2021, and December 9, 2021 (collectively, with the original petition, the "Petition"). The FDA ultimately denied the Petition on February 10, 2022 "solely on the grounds that [the] requests are not the appropriate subject of a citizen petition." By that time, however, multiple governmental agencies had commenced investigations into the Company.

77.    On November 17, 2021, a *Wall Street Journal* article announced that the SEC was investigating allegations that Cassava, which was the sixth-best performing stock that year, had engaged in manipulation of research data from clinical trials of simufilam. According to the article, the NIH, according to then-CEO Barbier, had awarded Cassava and its academic collaborators $20 million in grants between 2015 and the time of publication for drug development, and was also examining Cassava's conduct.

78.    On July 27, 2022, Reuters reported that the DOJ had commenced a criminal investigation into allegations of research data manipulation by Cassava with respect to the simufilam clinical trials. Cassava denied any allegations of wrongdoing but disclosed it was in receipt of confidential requests for information from government agencies (though it refused to identify which agencies).

79.    That same day, the Company issued a press release entitled "Cassava Sciences Responds to Media Reports." Therein, the Company "reiterated today what it had previously disclosed in 2021, that certain government agencies had requested information from the

Company." The press release elaborated that all "government requests for information were made in response to allegations of research misconduct made in 2021 by financial motivated short-sellers of the Company's stock." The Company continued to refuse to identify which government agencies had submitted the requests for information.

80.     In September 2022, the FDA conducted an inspection of Dr. Wang's laboratory at CUNY related to the Phase 2b Study, and in so doing identified various deficiencies in the study. These included, among other things, "inadequate source records to reconstruct the study," including failure to maintain "sample storage and tracking," documentation of "experimental procedures," and "[s]ource records for Western blot analysis." Furthermore, the FDA found that Dr. Wang had failed to conduct stability assessments to support the sample shipment storage and handling conditions for the cerebrospinal fluid samples in the study, and that he had similarly failed to implement any form of access control to computers to ensure data security. The FDA inspection also disclosed that the DOJ had begun investigating and had taken files from Dr. Wang's laboratory and computer.

81.     By this time, beginning in or around April 2022, Cassava had conducted its own audit of Dr. Wang's CUNY laboratory in connection with the Phase 2b Study. Cassava's own internal investigation found it was "unacceptable and temporarily not qualified to provide biomarker analysis and research for services for any future Cassava studies." Cassava, however, chose not to disclose the findings of this audit to investors, and refused to sever ties with Dr. Wang until June 2024.

82.     CUNY also investigated Dr. Wang's laboratory, and on October 12, 2023, the journal *Science* reported that it had received from an anonymous source a fifty-page final report from CUNY detailing its investigation of Dr. Wang between Fall 2021 and May 2023 (the "CUNY

Report"). The CUNY Report revealed that a committee of research faculty at CUNY had examined thirty-one allegations of research misconduct against Dr. Wang and had found "evidence highly suggestive of deliberate scientific misconduct by Dr. Wang for 14 of the 31 allegations." These included but were not limited to "image aberrations that may be consistent with the fabrication/manipulation of the data," and that investigators "were unable to objectively assess the merit of the allegations due to the failure of Dr. Wang to provide underlying, original data or research records," as well as the "low quality of the published images that had to be examined in their place." The investigative committee also found "long-standing and egregious misconduct in data management and record keeping by Dr. Wang." The investigation also determined that Defendant Burns bore partial responsibility for some of the alleged misconduct.

83.     The Company vehemently rejected the validity of the CUNY Report and its findings, stating:

> Cassava Sciences played no role in CUNY's investigation. The university turned down all requests for information and offers of assistance from Cassava. Because CUNY did not interview any employees of Cassava Sciences, the university has no legitimate basis to make accusations against the Company or its employees.
>
> CUNY has not responded to an inquiry from Cassava Sciences made yesterday regarding the authenticity of the leaked report.

84.     On October 27, 2023, CUNY publicly stated that it was going to "stay the underlying inquiry into the allegations regarding Dr. Wang's research until such time as the University completes a comprehensive investigation of" the methodology and process utilized in conducting its investigation, given the breach resulting in the leak of the CUNY Report.

85.     Despite this, on June 28, 2024, the Dr. Wang's misconduct became harder to ignore when a federal grand jury indicted Dr. Wang for falsification of data to obtain NIH grants.

86.     Subsequently, on July 1, 2024, the Company finally disclosed that the DOJ and

SEC had been investigating the Company and two senior employees related to the Phase 2b Study, that the Company had conducted an internal investigation into the matter, and that the Company possessed an email from Defendant Burns to Dr. Wang that enabled him to unblind himself as to some study participants before conducting the final analysis of the data for the Phase 2b Study.

87.     Despite the foregoing, the Company did not disclose that the two senior employees were Defendants Barbier and Burns, and continued to tout both the Company's commitment to transparency and the results of the Phase 2b Study, even while announcing Defendants Barbier and Burns's immediate resignation without elaboration.

### *The Company Proceeds to Phase 3 Clinical Studies*

88.     Even as public and governmental scrutiny of the Phase 2b Study mounted, the Company continued to conduct its Phase 3 clinical trials, initiating two randomized, placebo-controlled Phase 3 Studies of simufilam: RETHINK-ALZ and REFOCUS-ALZ. The only bases for moving forward with these studies were the results from the Phase 2a Study and Phase 2b Study, which were brief and small, in addition to being subject to investigation as a result of Dr. Wang's misconduct. Worse still, the Phase 2 Study was not yet complete when the Company initiated its Phase 3 studies.

89.     RETHINK-ALZ aimed to evaluate the safety and efficacy of simufilam 100mg tablets in enhancing cognition and slowing cognitive and functional declines in patients with mild-to-moderate Alzheimer's disease, as compared to a placebo administered over 52 weeks in a multi-center, double-blinded, placebo-controlled, and randomized parallel group involving over 75 clinical trial locations in the United States, Australia, and Canda. The trial randomized 804 people who were confirmed to have mild or moderate cases of Alzheimer's disease. RETHINK-ALZ assessed patients according to the ADAS-Cog and ADCS-ADL scales to compare the placebo

group results with the results of those taking simufilam. Secondary and tertiary objectives included assessing simufilam's effect on neuropsychiatric symptoms and the burden of caregiving, as well as investigating the effect of simufilam on plasma biomarkers. To that end, the study included a pharmacokinetic and plasma biomarker sub-study including approximately 100 subjects, evaluated at three points in time. An Independent Data Safety and Monitoring Board met periodically to review subject safety and determine whether dosing could continue.

90.     REFOCUS-ALZ was designed to be a multi-center, double-blinded, placebo-controlled, and randomized parallel group study. Its intent was to evaluate the safety and efficacy of simufilam 100mg and 50mg tablets as compared to a placebo over the course of 76 weeks. It was to involve over 75 clinical trial locations located in the United States, Canada, Puerto Rico, and South Korea, and all sites were to be distinct from those used in RETHINK-ALZ. Utilizing RETHINK-ALZ's eligibility criteria, the trial randomized approximately 1,125 people. Like RETHINK-ALZ, REFOCUS-ALZ sought to assess patients using the ADAS-Cog and ADCS-ADL scales for comparing the medicated and placebo groups. The study also included evaluations of the changes in plasma and cerebrospinal fluid biomarkers from the baseline to the end of the study, with magnetic resonance imaging and positron emission tomography scans.

91.     The Company also initiated an open-label extension study for the Phase 3 program to provide zero-cost access to simufilam for thirty-six months or until a new drug application for simufilam had been reviewed by the FDA. This study was open to patients who successfully completed a Phase 3 study and elected to participate. Approximately 88% of patients who completed treatment in RETHINK-ALZ or REFOCUS-ALZ entered the open-label extension study.

92.     Even as it undertook to commence these clinical trials, however, the Company

31

failed to disclose that only 116 of the ITT population of 219 from the Phase 2 Study were analyzed for the published results of the Phase 2 Study. That is, only approximately 53% of the ITT population was actually included in the results analysis. This constitutes a serious violation of the E9 Principles, which require the FAS be "used to describe the analysis set which is . . . as close as possible to the intention-to-treat ideal of including all randomized subjects." No exception exists for patients who opt to discontinue treatment during the trial. Despite this, the Phase 2 Study excluded patients unavailable for a cognition assessment at the conclusion of the trial or who had dropped out before its conclusion. This information was only revealed on February 12, 2025.

93.     This omission is significant because it renders the results of the Phase 2 Study at best inconclusive. For example, the largest separation in performance between the placebo and active treatment populations occurred at the end of the six-month randomized withdrawal period (month eighteen of the study). At this point, those undergoing treatment outperformed those in the placebo group by 1.2 points on the ADAS-Cog scale. While stripped of context this sounds positive, it ignores that the prior measurement, taken after patients were taken off of simufilam for three months, showed that at that point the placebo group *also* showed improvements: their score only deviated from the group undergoing treatment by a mere 0.2 points on the ADAS-COG scale.

### *The Phase 3 Clinical Studies Fail*

94.     On November 25, 2024, Cassava announced the topline results from the Phase 3 RETHINK-ALZ study, admitting that simufilam failed to meet the pre-specified, co-primary, secondary, and/or exploratory biomarker endpoints. The Company announced that it would thus be forced to discontinue the Phase 3 REFOCUS-ALZ study and the open-label extension study. In a press release issued on March 25, 2025, the Company ultimately had to report that simufilam "did not show a significant reduction in co-primary endpoints of cognitive or functional decline

versus placebo in patients with mild-to-moderate Alzheimer's disease."

**False and Misleading Statements**

*October 12, 2023 Press Release*

95.     On October 12, 2023, the Company issued a press release responding to the CUNY Report allegations. The press release quoted Defendant Barbier and listed Defendant Schoen as the contact person for more information on the matter.

96.     The response downplayed and attempted to undermine the credibility of the CUNY investigation results, including its findings that there was "evidence highly suggestive of deliberate scientific misconduct by Dr. Wang," and that the Company's own officer, Defendant Burns, bore some responsibility as well.

97.     The press release stated, in relevant part:

CUNY's report makes no findings of data manipulation. Rather, "the egregious misconduct" cited in the report relates exclusively to internal record-keeping failures at CUNY. The report also finds that internal record-keeping failures "prevented [CUNY] from making an objective assessment" of the allegations of research misconduct.

[…]

Cassava Sciences played no role in CUNY's investigation. The university turned down all requests for information and offers of assistance from Cassava. Because CUNY did not interview any employee of Cassava Sciences, the university has no legitimate basis on which to make accusations of the allegations of research misconduct.

CUNY has not responded to an inquiry Cassava Sciences made yesterday regarding the authenticity of the leaked report.

Importantly, Cassava Sciences does not rely exclusively on research at CUNY.

*November 7, 2023 Form 10-Q*

98.     On November 7, 2023, the Company filed on Form 10-Q with the SEC its report for the third quarter of 2023 (the "Q3 2023 10-Q"). The Q3 2023 10-Q was signed by Defendants

Barbier and Schoen, and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Barbier and Schoen attesting to the accuracy of the Q3 2023 10-Q and that the Q3 2023 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

99.    The Q3 2023 10-Q attempted to downplay the government investigations that had been ongoing since 2021, stating, in relevant part:

> On November 15, 2021, the Company disclosed that certain government agencies had asked the Company to provide corporate information and documents. These were confidential requests. The Company has been voluntarily cooperating and intends to continue to cooperate with these inquiries. ***No government agency has informed the Company that it has found evidence of research misconduct or wrongdoing by the Company or its officers, employees or directors*.**[2] No government agency has filed any claims or charges related to these inquiries. We cannot predict the outcome or impact of these ongoing matters, including whether a government agency may pursue an enforcement action against the Company or others.

100.    The statements described in ¶¶ 95-100 were materially false and/or misleading when made because it failed to disclose, inter alia, that: (1) the Company's own internal investigation had determined that Dr. Wang's laboratory "was unacceptable and temporarily not qualified" to provide Cassava any research services; (2) as a result of Dr. Wang's work with Defendant Burns, the DOJ and SEC were investigating Cassava, Defendant Burns, and Defendant Barbier; (3) as a result of the foregoing, the information regarding simufilam's effectiveness was unreliable; and (4) the Company failed to maintain adequate internal controls.

***February 7, 2024 Press Release***

101.    On February 7, 2024, the Company issued a press release announcing the topline

---

[2] All emphasis is added, unless otherwise indicated.

results for simufilam's Phase 2 Study, titled "No Decline in Cognition Scores in Patients with Mild Alzheimer's Disease Who Received Simufilam Continuously For 24 Months."

102.    The press release noted the following results as well as the conditions of the study:

• Patients with mild Alzheimer's disease who received simufilam treatment continuously for two years (n=47) had no decline in ADAS-Cog scores (± 1.51 SE) as a group.

• Patients with mild Alzheimer's who received simufilam treatment non-continuously (n=40) declined 1 point on ADAS-Cog (± 1.65 SE) as a group. Non-continuous treatment consisted of one year on open-label drug, six months on placebo and six months back on open-label drug.

• In patients with mild Alzheimer's, the largest separation between the continuous and non-continuous treatment groups occurred at the end of the 6-month randomized, placebo-controlled withdrawal phase.

• Patients with moderate Alzheimer's who received simufilam treatment continuously for two years (n=32) declined 11.05 points on ADAS-Cog (± 1.91 SE) as a group.

### *February 28, 2024 Press Release*

103.    On February 28, 2024, the Company issued a press release entitled "Cassava Reports Full-year 2023 Financial Results and Corporate Updates." This press release quoted Defendants Schoen and Barbier, and listed Schoen as the primary contact person. The Company also attached a copy of this press release as an exhibit to a Form 8-K which the Company filed that same day, which was signed by Defendant Schoen.

104.    Regarding the Phase 2b Study results, the press release stated, in relevant part:

In February 2024, we reported that patients with mild Alzheimer's disease who received simufilam treatment continuously for two years . . . had no decline in ADAS-Cog scores . . . as a group. Patients with mild Alzheimer's who received simufilam treatment non-continuously for two years . . . declined 1 point on the ADAS-Cog . . . as group.

### *February 28, 2024 Form 10-K*

105.    On February 28, 2024, the Company filed on Form 10-K with the SEC its annual

report for the year 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants Barbier,

Schoen, Anderson, Barry, Gravier, Gussin, Nicaise, O'Donnell, and Scannon and attached SOX

certifications signed by Defendants Barbier and Schoen attesting to the accuracy of the 2023 10-

K and that the 2023 10-K "does not contain any untrue statement of a material fact or omit to state

a material fact necessary to make the statements made, in light of the circumstances under which

such statements were made, not misleading."

106.     The 2023 10-K included a summary of the Phase 2 Study results, stating, in relevant

part:

> Average changes in ADAS-Cog scores, baseline to month 24, indicate the following:
>
> •       Patients with mild Alzheimer's disease who received simufilam treatment continuously for two years (n=47) had no decline in ADAS-Cog scores (± 1.51 SE) as a group.
>
> •       Patients with mild Alzheimer's who received simufilam treatment non-continuously (n=40) declined 1 point on ADAS-Cog (± 1.51 SE) as a group. Non-continuous treatment consisted of one year on open-label drug, six months on placebo and six months back on open-label drug.
>
> •       In patients with mild Azheimer's, the largest separation between the continuous and non-continuous treatment groups occurred at the end of the 6-month randomized, placebo-controlled withdrawal phase.
>
> [. . .]
>
> Patients with mild Alzheimer's disease (n=87) started the 24 months study with MMSE 21-26, with ten exceptions [*i.e.*, patients with MMSE > 26 due to prior participation in a study of simufilam (n=2) or evidence of Alzheimer's disease pathology (n=8)]. Patients with moderate Alzheimer's disease started the 24 months study with MMSE 16-20, with one patient who entered with MSME 15.
>
> The pre-specified cognition endpoints were analyzed on the Full Analysis Set (FAS) by an independent consulting firm that specializes in complex statistical analysis of clinical trial results. The FAS population consists of all study participants who received at least one dose of treatment and have both baseline and at lease one post-baseline assessment. (Because FAS data is specific to each phase of a study, the FAS for the 24-month study may differ from the FAS for other phases).

36

107.    The 2023 10-K also showed the following chart which summarized the Phase 2 Study results:



108.    The statements described in ¶¶ 101-107 were materially false and/or misleading when made because it failed to disclose, inter alia, that: (1) the unadulterated data from simufilam's Phase 2 Study did not evidence the drug's potential as an effective Alzheimer's treatment; (2) simufilam's Phase 3 study would yield similarly unimpressive results concerning the drug's effectiveness; (3) simufilam would be incapable of hindering the progression of Alzheimer's Disease even in mild to moderate cases; (4) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; and (5) the Company failed to maintain adequate internal controls.

109.    The 2023 10-K also attempted to downplay the seriousness of the ongoing governmental investigations, stating, in relevant part:

37

On November 15, 2021, we disclosed that certain government agencies had asked us to provide corporate information and documents. These were confidential requests. We have been voluntarily cooperating and intend to continue to cooperate with these inquiries. ***No government agency has informed us that it has found evidence of research misconduct or wrongdoing by the Company or its officers, employees, or directors***. No government agency has filed any claims or charges related to these inquiries. We cannot predict the outcome or impact of these ongoing matters, including whether a government agency may pursue an enforcement action against the Company or others.

110.    The 2023 10-K also reported that the Company's Board had retained Orrick LLP to

investigate the allegations raised in the Citizen Petition, stating in relevant part:

Beginning in August 2021, certain individuals, later revealed to be short sellers of the Company's securities, publicly alleged that ***the Company and certain of its employees and third-party collaborators*** had engaged in research misconduct in connection with the development of simufilam. These allegations related in part to research that was conducted at [CUNY] pursuant to research contracts with the Company.

The Company takes allegations of research misconduct seriously. ***Accordingly, the Company's Board of Directors engaged the law firm [Orrick] to investigate these allegations. The investigation had access to Company personnel, communications, documents, data, and information, and counsel was assisted by technical experts with relevant experience and knowledge. The investigation has found no evidence to substantiate allegations that the Company or its employees engaged in or were aware of research misconduct.***

***Presentation at the International Conference on Alzheimer's and Parkinson's Disease***

111.    Between March 5 and March 9, 2024, Defendant Burns presented on behalf of the

Company at the International Conference on Alzheimer's and Parkinson's Disease in Lisbon,

Portugal (the "2024 A&P Conference").

112.    During the 2024 A&P Conference, Defendant Burns presented the below slide,

touting the results of the Phase 2b Study, and boasting that the results therefrom showed

"[i]mprovements observed in research-use-only CSF biomarkers" as well as "[e]ncouraging

effects on cognition." The slide, in its entirety, appears as follows:

## Simufilam Phase 2 Trials in Mild-to-moderate AD

- **1-month, placebo-controlled safety trial of simufilam 50 & 100 mg in 64 patients**
  - Improvements observed in research-use-only CSF biomarkers
  - Encouraging effects on cognition (two tests of CANTAB battery)

- **12-month, open-label safety trial of simufilam 100 mg in 216 patients**
  - 47% of patients improved on ADAS-cog11.
  - Mild AD patients (MMSE 21-26) improved on ADAS-Cog11 by –0.73 points [95% CI –2.33 to 0.88].
  - Full Analysis Set (MMSE 16-26) declined on ADAS-Cog11 by 1.54 points [95% CI 0.25 to 2.82].

- **6-month, randomized withdrawal study in 154 patients**
  - In the Full Analysis Set, 38% slowing of decline versus placebo
  - In mild AD patients, an improvement on simufilam compared to a decline on placebo (p=0.14)



AD/PD 2024    14

113.     The statements described in ¶¶ 109-112 were materially false and/or misleading when made because it failed to disclose, inter alia, that: (1) the Company's own internal investigation had determined that Dr. Wang's laboratory "was unacceptable and temporarily not qualified" to provide Cassava any research services; (2) as a result of Dr. Wang's work with Defendant Burns, the DOJ and SEC were investigating Cassava, Defendant Burns, and Defendant Barbier; (3) as a result of the foregoing, the information regarding simufilam's effectiveness was unreliable; and (4) the Company failed to maintain adequate internal controls.

### *March 26, 2024 Proxy Statement*

114.     On March 26, 2024, the Company filed the 2024 Proxy Statement with the SEC. The 2024 Proxy Statement was solicited by Defendants Barry, Anderson, Barbier, Gravier, Gussin, Nicaise, O'Donnell, and Scannon, pursuant to Section 14(a) of the Exchange Act, and contained materially false and misleading statements.

115.     The 2024 Proxy Statement solicited shareholders to vote to, *inter alia*: (1) re-elect Defendants Barbier and Scannon as Class III directors to serve for three-year terms; (2) ratify the selection of Ernst & Young LLP ("EY") as the Company's independent registered public

accounting firm for 2024; and (3) approve, by a non-binding, advisory vote, the 2023 executive

compensation for the Company's named executive officers.

116.     With respect to the Code of Ethics, the 2024 Proxy Statement stated:

The Company has adopted a Code of Ethics that applies to all its directors and employees, including its senior financial and principal executive officers. The Code of Ethics covers a variety of matters, such as acting with integrity and compliance with laws, including anti-corruption laws. Amendments to and waivers, if any, of the Code of Ethics as it pertains to the principal executive officer, principal financial officer, and principal accounting officer, if any, will be disclosed on our website. The Code of Business Conduct is available on the Company's website at www.cassavasciences.com.

117.     In a section titled "Board of Directors' Role in Risk Oversight," the 2024 Proxy

Statement stated the following:

One of the key functions of the Board of Directors is informed oversight of the risk management process. The Board administers this oversight function directly through the Board of Directors as a whole, as well as through its standing committees that address risks inherent in their respective areas of oversight. Areas of focus include economic, operational, financial (accounting, credit, investment, liquidity and tax), competitive, legal, regulatory, cybersecurity, privacy, compliance and reputational risks. The risk oversight responsibility of the Board of Directors and its committees is supported by the management reporting processes, which are designed to provide visibility to the Board of Directors and to the personnel who are responsible for risk assessment and information about the identification, assessment and management of critical risks, and management's risk mitigation strategies.

The Audit Committee is responsible for reviewing and discussing major financial risk exposures and the steps management has taken to monitor and control these exposures, including guidelines and policies with respect to risk assessment and risk management. The Audit Committee also monitors compliance with legal and regulatory requirements and assists the Board of Directors in fulfilling its oversight responsibilities with respect to risk management. The Compensation Committee assesses and monitors whether any of the compensation policies and programs has the potential to encourage excessive risk-taking.

The Company believes this division of responsibilities is an effective approach for addressing the risks the Company faces and that the board leadership structure supports this approach.

118.     The 2024 Proxy Statement was false and misleading because it failed to disclose,

*inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

119. The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company's own internal investigation had determined that Dr. Wang's laboratory "was unacceptable and temporarily not qualified" to provide Cassava *any* research services; (2) as a result of Dr. Wang's work with Defendant Burns, the DOJ and SEC were investigating Cassava, Defendant Burns, and Defendant Barbier; (3) as a result of the foregoing, the information regarding simufilam's effectiveness was unreliable; (4) the unadulterated data from simufilam's Phase 2 Study did not evidence the drug's potential as an effective Alzheimer's treatment; (5) simufilam's Phase 3 study would yield similarly unimpressive results concerning the drug's effectiveness; (6) simufilam would be incapable of hindering the progression of Alzheimer's Disease even in mild to moderate cases; (7) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; and (8) the Company failed to maintain adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

120. As a result of the material misstatements and omissions contained in the 2024 Proxy Statement, Company shareholders: (1) re-elected Defendants Barbier and Scannon to the Board, thereby allowing them to continue to breach their fiduciary duties to Cassava; (2) ratified the appointment of EY as the Company's independent registered public accounting firm for 2024; and

(3) approved, on a non-binding, advisory basis, the 2023 executive compensation for the Company's named executive officers.

***May 10, 2024 Form 10-Q***

121.    On May 10, 2024, the Company filed on Form 10-Q with the SEC its report for the first quarter of 2024 (the "Q1 2024 10-Q"). The Q1 2024 10-Q was signed by Defendants Barbier and Schoen and attached SOX certifications signed by Defendants Barbier and Schoen attesting to the accuracy of the Q1 2024 10-Q and that the Q1 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

122.    The Q1 2024 10-Q continued to downplay the government investigations that had been ongoing since 2021, stating in relevant part, that:

> On November 15, 2021, the Company disclosed that certain government agencies had asked the Company to provide corporate information and documents. These were confidential requests. The Company has been voluntarily cooperating and intends to continue to cooperate with these inquiries. ***No government agency has informed the Company that it has found evidence of research misconduct or wrongdoing by the Company or its officers, employees, or directors***. No government agency has filed any claims or charges related to these inquiries. We cannot predict the outcome or impact of these ongoing matters, including whether a government agency may pursue an enforcement action against the Company or others.

123.    The Q1 2024 10-Q also discussed the purported results of the Phase 2b Study, stating, in relevant part, the following:

> In September 2020, we reported final results of a Phase 2b study with simufilam in Alzheimer's disease. ***In this clinical study funded by the NIH, Alzheimer's patients treated with 50 mg or 100 mg of simufilam twice-daily for 28 days showed statistically significant . . . improvements in CSF biomarkers of disease pathology, neurodegeneration, and neuroinflammation, versus Alzheimer's patients who took placebo. . . . In addition, Alzheimer's patients treated with simufilam showed improvements in validated tests of episodic memory and spatial working memory, versus patients on placebo. . . .***

Given the absence of observable dose-limiting effects in our Phase 1 and Phase 2 studies, and in light of the strong scientific rationale and multiple peer-reviewed publications and research grant awards, we determined that simufilam demonstrated favorable proof-of-principle for further evaluation as an investigational drug for the treatment of Alzheimer's disease.

124.    The statements described in ¶¶ 121-123 were materially false and/or misleading when made because it failed to disclose, inter alia, that: (1) the Company's own internal investigation had determined that Dr. Wang's laboratory "was unacceptable and temporarily not qualified" to provide Cassava any research services; (2) as a result of Dr. Wang's work with Defendant Burns, the DOJ and SEC were investigating Cassava, Defendant Burns, and Defendant Barbier; (3) as a result of the foregoing, the information regarding simufilam's effectiveness was unreliable; and (4) the Company failed to maintain adequate internal controls.

125.    The Q1 2024 10-Q also included a similar summary of the Phase 2 Study results as the 2023 10-K. *Supra* ¶106.

126.    The Q1 2024 10-Q also included the same chart summarizing the results of the Phase 2 Study as the 2023 10-K. *Supra* ¶107.

127.    The statements described in ¶¶ 125-126 were materially false and/or misleading when made because they failed to disclose, *inter alia*, that: (1) the unadulterated data from simufilam's Phase 2 Study did not evidence the drug's potential as an effective Alzheimer's treatment; (2) simufilam's Phase 3 study would yield similarly unimpressive results concerning the drug's effectiveness; (3) simufilam would be incapable of hindering the progression of Alzheimer's Disease even in mild to moderate cases; (4) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; and (5) the Company failed to maintain adequate internal controls.

**The Truth Begins to Emerge While False and Misleading Statements Continue**

*June 28, 2024 DOJ Press Release*

128.    On June 28, 2024, a federal grand jury indicted Dr. Wang on charges of falsifying data to obtain roughly $16 million in grants from the NIH.

129.    That same day, the DOJ issued a press release which stated that the indictment alleged that between roughly May 2015 through April 2023, Dr. Wang had "engaged in a scheme to fabricate and falsify scientific data in grant applications made to the NIH on behalf of him and [Cassava]," which "sought funding for scientific research of a potential treatment and diagnostic test for Alzheimer's disease."

130.    On this news, the price per share of the Company's common stock fell by $6.60, or approximately 34.8%, from a closing price of $18.95 on June 27, 2024, to close at $12.35 on June 28, 2024.

*July 1, 2024 Press Release*

131.    On July 1, 2024, the Company issued a statement in response to announcement of Dr. Wang's indictment. The response was also filed with the SEC on Form 8-K, signed by Defendant Schoen.

132.    The response stated, in relevant part:

[Cassava] has been engaging with the [DOJ] and the [SEC] in connection with ongoing investigations into the Company **and two senior employees of the Company**. Cassava is cooperating with the DOJ and SEC in connection with these investigations.

In the course of ongoing discussions with the SEC regarding the Company's Phase 2b study of simufilam in Alzheimer's disease (the "Phase 2b Study"), the SEC recently provided the Company with new information obtained during its investigation. ***The Company's Board of Directors (the "Board") has empowered an Ad Hoc Investigation Committee (the "Committee"), comprising independent directors, to direct an investigation (the "Internal Investigation") of the information provided by the SEC. The Internal Investigation is also evaluating information contained in the DOJ indictment of Dr. Hoau-Yan Wang discussed below.*** This Committee, with the assistance of the Company's General Counsel, is

supervising outside counsel conducting the Internal Investigation. The Internal Investigation is continuing.

133.    The response further revealed that "***the Internal Investigation has determined that certain statistical information contained in an attachment to an email sent by a senior employee of Cassava to Dr. Wang before the bioanalysis could have been used to unblind him as to some number of Phase 2b Study participants.***"

134.    On this news, the price per share of the Company's common stock fell by $0.21, or approximately 1.7%, from a closing price of $12.35 on June 28, 2024, to close at $12.14 on July 1, 2024. However, the Individual Defendants continued to obfuscate the truth regarding the reliability of the Phase 2 Study results and simufilam's viability as a drug candidate.

### *July 17, 2024 Form 8-K*

135.    On July 17, 2024, the Company issued a Form 8-K with the SEC which announced that Defendant Barbier had resigned (the "July 17, 2024 Form 8-K"). The July 17, 2024 Form 8-K noted that "Mr. Barbier's resignation from the Board [was] not a result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices."

136.    The July 17, 2024 Form 8-K also announced that Defendant Burns and the Company had "agreed that Burns [would] step down from her employment with the Company, effective immediately." The July 17, 2024 Form 8-K noted that Defendant Burns would continue to "furnish consulting services" to the Company for one year.

137.    The July 17, 2024 Form 8-K also announced that Defendant Barry would replace Defendant Barbier as CEO and Executive Chairman of the Board.

138.    The July 17, 2024 Form 8-K's attached press release quoted Defendant Barry, who further touted the Company's commitment to integrity, stating that "While our priority remains the development of a potentially effective treatment for Alzheimer's disease, the Board has a steadfast

commitment to doing so with transparency, accountability, and highest ethical business practices."

139.    The press release similarly highlighted actions taken by the Company to achieve such practices, noting the Company's "single-minded commitment to scientific rigor and honest transparency with patients, government agencies and investors," emphasizing that the Phase 3 trials were "being run according to FDA and industry standards that ensure the integrity of all reported results." The press release promised transparency in Company communication with its stakeholders.

140.    The statements described in ¶¶ 135-136 and 138-139 were materially false and/or misleading when made because it failed to disclose, inter alia, that: (1) the Company's own internal investigation had determined that Dr. Wang's laboratory "was unacceptable and temporarily not qualified" to provide Cassava any research services; (2) as a result of Dr. Wang's work with Defendant Burns, the DOJ and SEC were investigating Cassava, Defendant Burns, and Defendant Barbier; (3) the departures of Defendants Burns and Barbier was directly caused by that investigation; (4) as a result of the foregoing, the information regarding simufilam's effectiveness was unreliable; and (5) the Company failed to maintain adequate internal controls.

### *July 21, 2024 Open Letter*

141.    On July 21, 2024, the Company published a letter entitled "An Open Letter from Executive Chairman Rick Barry to the Cassava Community: Shareholders, Employees, Principal Investigators, Patients and their Loved Ones" (the "July Open Letter"). The Company also attached an identical copy of the July Open Letter as an exhibit to a Form 8-K, signed by Defendant Schoen, and which it filed with the SEC on July 22, 2024.

142.    The July Open Letter quoted Defendant Barry, and emphasized the results of the Phase 2 Study, with Defendant Barry writing "I encourage you to study the cognition results from

Cassava's 24-month open-label Phase 2 clinical safety trial. ***Those results were unlike any Alzheimer's trial ever, reporting stable cognition for two full years in Alzheimer's disease patients with mild dementia.***"

143.    The statements referenced in ¶¶ 141-142 were materially false and/or misleading when made because they failed to disclose, *inter alia*, that: (1) the Company's own internal investigation had determined that Dr. Wang's laboratory "was unacceptable and temporarily not qualified" to provide Cassava *any* research services; (2) as a result of Dr. Wang's work with Defendant Burns, the DOJ and SEC were investigating Cassava, Defendant Burns, and Defendant Barbier; (3) the departures of Defendants Burns and Barbier was directly caused by that investigation; (4) as a result of the foregoing, the information regarding simufilam's effectiveness was unreliable; (5) the unadulterated data from simufilam's Phase 2 Study did not evidence the drug's potential as an effective Alzheimer's treatment; (6) simufilam's Phase 3 study would yield similarly unimpressive results concerning the drug's effectiveness; (7) simufilam would be incapable of hindering the progression of Alzheimer's Disease even in mild to moderate cases; (8) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; and (9) the Company failed to maintain adequate internal controls.

### *August 8, 2024 Form 10-Q*

144.    On August 8, 2024, the Company filed on Form 10-Q with the SEC its report for the second quarter of 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-Q was signed by Defendants Barry and Schoen and attached SOX certifications signed by Defendants Barry and Schoen attesting to the accuracy of the Q2 2024 10-Q and that the Q2 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

145.    The Q2 2024 10-Q finally revealed the full extent of the DOJ and SEC

investigations, stating the following:

> Beginning in August 2021, the Company has received subpoenas, a Civil Investigative Demand ("CID") and other requests for documents and information from the Department of Justice and document requests from the Securities and Exchange Commission, each seeking corporate information and documents concerning the research and development of simufilam and/or SavaDX. The Company has been providing documents and information in response to these subpoenas, CID, and requests for information and intends to continue to cooperate with these government inquiries. The Company cannot predict the outcome or impact of these ongoing matters, including whether the government authority may pursue an enforcement action against the Company or others.

> ***The Company is in the advanced stages of discussions with the SEC staff to resolve the SEC's nearly three-year investigation of the Company's disclosures regarding its Phase 2b study of simufilam for the treatment of Alzheimer's disease (the "Phase 2b Study"). The Company has reserved a loss contingency of $40 million on its consolidated balance sheet as of June 30, 2024 relating to this potential settlement with the SEC.***

> The Company continues to cooperate with the DOJ related to conduct alleged in the indictment of Dr. Hoau-Yan Wang announced by the Department of Justice on June 28, 2024.

146.    The Q2 2024 10-Q provided additional information pertaining to Dr. Wang's indictment while attempting to distance the Company from Dr. Wang by repeating that Dr. Wang was not involved in the Phase 3 studies. In relevant part, the Q2 2024 10-Q stated:

> On June 28, 2024, the DOJ announced that a federal grand jury in the U.S. District Court for the District of Maryland returned an indictment of Dr. Wang. The indictment alleges that Dr. Wang caused Cassava to submit grant applications to the [NIH] that contained false and fraudulent representations about his research. Among other things, the indictment alleges that Dr. Wang made materially false, fraudulent, and misleading statements to the NIH regarding the mechanism by which the Company's therapeutic product candidate, simufilam, was designed to treat Alzheimer's disease and the improvement of certain Alzheimer's disease indicators in patients treated with simufilam, and that Dr. Wang manipulated or otherwise fabricated research results, including Western Blot images that he prepared.

> Dr. Wang, who is employed as a professor at [CUNY], previously served as a scientific collaborator and advisor to Cassava. Dr. Wang's research, including foundational research published together with Dr. Lindsay Burns, Cassava's former SVP, Neuroscience, led to the discovery of simufilam. Among other work for

Cassava, Dr. Wang's laboratory at CUNY conducted the final bioanalysis for the Phase 2b Study, which the Company reported as part of the final results of the Phase 2b Study.

Dr. Wang received compensation from the Company for his consulting and advisory work for Cassava. . . . Prior to Dr. Wang's indictment, the Company terminated its consulting relationship with him . . . .

*Neither Dr. Wang nor his laboratory at CUNY has had any involvement at any time in the Company's ongoing Phase 3 clinical trials of simufilam.*

147.     The Q2 2024 10-Q also contained language which for the first time cautioned investors that they should "not place undue reliance" on the Phase 2b Study results. Under the heading "Risk Factors," the Q2 2024 10-Q included a subheading "The validity of CSF biomarker assays and bioanalysis conducted by CUNY for the Company's Phase 2b Study has been called into question." This section provided the following risk warning, in relevant part:

The Company's Phase 2b Study was designed as a 28-day, approximately 60-patient, randomized, double-blind, placebo-controlled, multiple dose study. A primary objective of the Phase 2b Study was to measure changes in levels of cerebral spinal fluid ("CSF") biomarkers in study participants from baseline value to Day 28. *CSF biomarker assays and related bioanalysis for the Phase 2b Study (the "CUNY Bioanalysis") were conducted by the laboratory at CUNY of Dr. Hoau-Yan Wang, formerly a paid scientific collaborator, consultant and advisor to Cassava. Based on the CUNY Bioanalysis, Cassava reported statistically significant improvements in CSF biomarkers in treatment groups as compared to placebo group for the Phase 2b Study.*

On June 28, 2024, the DOJ announced that a federal grand jury in the U.S. District Court for the District of Maryland returned an indictment of Dr. Wang alleging that he caused Cassava to submit grant applications to NIH that contained false and fraudulent representations about his research. Among other things, the indictment alleges that Dr. Wang made materially false, fraudulent, and misleading statements to NIH regarding the mechanism by which simufilam was designed to treat Alzheimer's disease and the improvement of certain Alzheimer's disease indicators in patients treated with simufilam, *and that Dr. Wang manipulated or otherwise fabricated research results, including Western Blot images that he prepared.*

*As part of the Internal Investigation being conducted by the Ad Hoc Investigation Committee of the Company's Board of Directors, the Committee is evaluating information contained in the DOJ indictment of Dr. Wang as well as information from the Company's ongoing discussions with the SEC. To date, the Internal*

49

***Investigation has determined that certain statistical information contained in an attachment to an email sent by a former senior employee of Cassava to Dr. Wang before the CUNY Bioanalysis of CSF biomarkers was conducted could have been used to unblind him as to some number of Phase 2b Study participants. Unblinded information, if accessed in connection with bioanalysis, could be improperly utilized to manipulate underlying samples or data to skew reported results.***

The Internal Investigation has not, to date, determined, and may never be able to determine with any reasonable degree of certainty, whether Dr. Wang unblinded himself as to some number of Phase 2b Study participants. ***Nevertheless, the fact that Dr. Wang possessed information that could have been used to so unblind himself, together with the allegations in the DOJ indictment, undermine the blinded study design and create substantial uncertainty about the validity of the CUNY Bioanalysis of CSF biomarkers.*** There can be no assurance that such uncertainty will not adversely impact the FDA's review of an NDA with respect to simufilam following completion of our Phase 3 clinical studies or cause the FDA to request additional information regarding simufilam.

***Accordingly, in light of the foregoing uncertainties, you should not place undue reliance on the CUNY Bioanalysis of CSF biomarkers reported by the Company in connection with the Phase 2b Study.***

148.    On this news, the price per share of the Company's common stock fell by $4.18, or approximately 13.8%, from a closing price of $30.20 on August 7, 2024, to close at $26.02 on August 8, 2024. However, the Individual Defendants continued to obfuscate the truth regarding the reliability of the Phase 2 Study results and simufilam's viability as a drug candidate.

149.    For example, the Q2 2024 10-Q also included a similar summary of the Phase 2 Study results as the 2023 10-K. *Supra* ¶106.

150.    The Q2 2024 10-Q also included the same chart summarizing the results of the Phase 2 Study as the 2023 10-K. *Supra* ¶107.

***August 8, 2024 Earnings Call***

151.    On an earnings call held with investors and analysts that same day to discuss the second quarter results,  Defendant Kupiec discussing the Phase 3 clinical trials and expressing his confidence in simufilam's progress based on the Phase 2 Study's results. In relevant part,

50

Defendant Kupiec stated:

> *I was excited when I joined Cassava, but I'm even more excited and optimistic now about simufilam and its chance for success in Phase 3. Simufilam continues to be safe and well tolerated in a very large number of patients. Plus, the data from the 24-month open-label Phase 2 safety study was remarkable in that patients with mild dementia apparently had no significant decline during that two-year treatment period.* If this is true and replicated in Phase 3, it would represent an exceptional achievement and a significant advance in the field.

### H.C. Wainwright 26th Annual Global Investment Conference

152.    Defendant Barry presented on behalf of the Company at the H.C. Wainwright 26th Annual Global Investment Conference (the "Wainwright Conference"), which took place between September 9 and September 11, 2024.

153.    During his presentation, Defendant Barry emphasized the potential of simufilam based on the Phase 2 Study results, stating, in relevant part:

> *So this, . . . what we've seen so far, phase 2 results is, this to me was, you know, very impressive and one of the reasons I'm here*, is that in the phase 2, you know, we started with 216 patients and it was, you know, there were certainly weaknesses in the trial: it was open label, everybody knew they were getting the drug, but after 12 months there were 216 patients. After 12 months, patients were given the option of remaining on the drug or terminating the trial, or if they wanted to remain on the drug the way to do it was 50% of those would be assigned to a placebo group for 6 months and 50% would stay on the drug. And then after that additional 6 months, everybody would be back on the drug. *And what was persuasive about that trial, at least to me, was that the uh – at the end of 2 years the mild patients in the trial showed virtually no cognition decline. I mean that is unheard of. And, you know, again, there are weaknesses: phase 2 trial, open label, but uh – nobody has seen results like that before.*

> \* \* \*

> *We're really excited to see the data. It's uh, you know, again, we look the - at what we saw in phase 2, we look at what we've seen in biomarkers, we look at the method of action.* If this works this will be – you know this could be a disease modifying drug that treats Alzheimer's and it may have – so far what we've seen – is a safety profile that's just really pristine.

> \* \* \*

*[I]n that phase 2, when the patients when into that period where, you know, half of them stayed on the drug and half went off. I actually found that really persuasive again, its – we're going to see in phase 3 whether that holds up. The interesting thing is the patients that went on placebo for six months, they did decline, but they didn't decline very much. To me, again I'm not a scientist, so take this with a grain of salt, that would suggest to me that the drug might actually have disease modifying qualities, because the patients should have declined a lot faster. We'll see.*

154.    The statements referenced in ¶¶ 149-153 were materially false and/or misleading when made because they failed to disclose, *inter alia*, that: (1) the unadulterated data from simufilam's Phase 2 Study did not evidence the drug's potential as an effective Alzheimer's treatment; (2) simufilam's Phase 3 study would yield similarly unimpressive results concerning the drug's effectiveness; (3) simufilam would be incapable of hindering the progression of Alzheimer's Disease even in mild to moderate cases; (4) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; and (5) the Company failed to maintain adequate internal controls.

### *September 26, 2024 SEC Complaint*

155.    On September 26, 2024, after the close of trading, the SEC filed charges against the Company as well as Defendants Barbier and Burns for their involvement in and misleading statements about the Phase 2b Study (the "SEC Complaint").

156.    The SEC Complaint announced that parties had reached a settlement, and alleged, *inter alia*, that: (1) Cassava's statements about negligence in conducting the blinded studies omitted the material information that Defendant Burns provided Dr. Wang with sufficient information to partially unblind himself during the Phase 2b Study; (2) that the Company and Defendants Barbier and Burns failed to disclose the Phase 2b Study results of the bionalyses were performed by Dr. Wang; (3) that Dr. Wang had conflicts of interest due to his professional and financial ties to the Company as a consultant and member of its Scientific Advisory Board; (4)

Cassava and Defendant Barbier failed to disclose that the Company's audit of Dr. Wang's laboratory found it "unacceptable and temporarily not qualified to provide biomarker analysis and research services for any future Cassava studies;" (5) the Company and Defendant Burns failed to disclose Defendant Burns's removal of a large portion of patients (approximately 40%) from reported cognition data, the average change in errors from baseline to day 28 of the full episodic memory data set, and that Defendant Burns was unblinded when she decided which patients to exclude form the reported results; and (6) that the Company and Defendant Burns failed to disclose the spatial working memory measurement reported in the Phase 2b Study results that showed improvement of up to 46% was a measurement selected by Defendant Burns only after she was unblinded and other measurements labeled "key" prior to her unblinding did not show directional improvements in patients given simufilam.

157. As a result, the Company and Defendants Barbier and Burns consented to civil injunctions against future violations, agreeing to pay penalties in the respective amounts of $40 million, $175,000, and $85,000. Defendants Barbier and Burns also agreed to bars against holding officer or director positions for three and five years, respectively.

158. In a related order, the SEC charged Dr. Wang for manipulating the reported clinical results, knowing that the Company would disclose the data. Dr. Wang consented to a cease-and-desist order and a $50,000 penalty.

159. On this news, the price per share of the Company's common stock fell by $3.38, or approximately 10.6%, from a closing price of $31.87 on September 26, 2024, to close at $28.49 on September 27, 2024. However, the Individual Defendants continued to obfuscate the truth regarding the reliability of the Phase 2 Study results and simufilam's viability as a drug candidate.

***October 8, 2024 Open Letter***

160. On October 8, 2024, Defendant Barry announced the purportedly promising Phase

2 Study results while simultaneously working to downplay the significance of the still-swirling controversy regarding the Phase 2b Study in an open letter entitled "An Open Letter from President and CEO Rick Barry to the Cassava Community: Patients and their Loved Ones, Caregivers, Principal Investigators, Shareholders and Employees" (the "October Open Letter"). The October Open Letter was also attached to a Form 8-K which the Company filed with the SEC, signed by Defendant Schoen, on that same day.

161.   In relevant part, the October Open Letter stated;

We have been asked a lot of questions about the SEC settlement and our Phase 2b study. The Phase 2b study was a 28-day trial with 64 patients across three arms that was not powered for statistical significance. ***Given the inherent limitations of such small sample sizes, often referred to as the tyranny of small numbers, the Company believes that it is more helpful to focus on examining the two-year Phase 2 safety study that concluded earlier this year.***

***The Phase 2 study enrolled 216 patients and consisted of a 12-month open-label treatment phase followed by a six-month "cognition maintenance study" at month 12 in which patients were randomized 1:1 between drug and placebo. For the last six months of the trial, all patients were again administered simufilam.*** Statistical analysis for the Phase 2 trial was performed by Pentara based on raw data collected at 16 clinical sites in the US.

Among the results of this Phase 2 study, 47 mild patients who took open-label simufilam continuously for 24 months experienced no mean decline in cognition as measured by ADAS-Cog11 as a group. Another 40 mild patients who took placebo for six of the 24 months declined by a mean of one point as a group. ***During the six-month randomization period, mild patients who were administered drug showed a trend of performing better as a group than those administered placebo***, though this small, randomized portion of the study was not powered for, and did not reach, statistical significance. Patients in the study with moderate Alzheimer's, including the 32 moderate patients who received simufilam treatment continuously for two years, declined in cognition much more than mild patients.

I recommend that you review the results for yourself.

[…]

***We recognize the serious questions raised about some of the work performed at City University of New York, but those accusations do not negate the entire scientific body of evidence for our drug. We have previously highlighted***

*independent research that supports the biological activity of simufilam, such as that conducted by researchers at the Cochin Institute in Paris and at Yale University. We are evaluating ways to make this information more readily accessible for journalists, investors, or anyone curious about our drug. We believe that some of our critics have mischaracterized the scientific and clinical basis supporting simufilam, while cherry-picking and taking out of context statements that we have made. We encourage interested parties to make their own determination in light of the information that we have provided.*

[. . .]

If our Phase 3 program produces success, we will have made a significant contribution to the millions of patients and their families who live with the reality of this disease. If we fail, no one will be more crestfallen than we will be, but we also will know that we have done our best. Our patients deserve no less.

### November 7, 2024 Form 10-Q

162.    On November 7, 2024, the Company filed on Form 10-Q with the SEC its report for the third quarter of 2024 (the "Q3 2024 10-Q"). The Q3 2024 10-Q was signed by Defendants Barry and Schoen and attached SOX certifications signed by Defendants Barry and Schoen attesting to the accuracy of the Q3 2024 10-Q and that the Q3 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

163.    The Q3 2024 10-Q also included a similar summary of the Phase 2 Study results as the 2023 10-K. *Supra* ¶106.

164.    The Q3 2024 10-Q also included the same chart summarizing the results of the Phase 2 Study as the 2023 10-K. *Supra* ¶107.

165.    The statements described in ¶¶ 160-164 were materially false and/or misleading when made because they failed to disclose, *inter alia*, that: (1) the unadulterated data from simufilam's Phase 2 Study did not evidence the drug's potential as an effective Alzheimer's treatment; (2) simufilam's Phase 3 study would yield similarly unimpressive results concerning the drug's effectiveness; (3) simufilam would be incapable of hindering the progression of

Alzheimer's Disease even in mild to moderate cases; (4) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; and (5) the Company failed to maintain adequate internal controls.

## THE TRUTH FULLY EMERGES

***November 25, 2024 Press Release***

166.    On November 25, 2024, Cassava issued a press release entitled "Cassava Sciences Topline Phase 3 Data Did Not Meet Co-Primary Endpoints." The press release was also filed with the SEC as an attachment to a Form 8-K signed by Defendant Schoen.

167.    The press release announced that the first Phase 3 trial, RETHINK-ALZ, had failed and that consequently the Company was discontinuing the second Phase 3 trial, REFOCUS-ALZ, quoting Defendants Barry and Schoen. The press release further stated that simufilam "did not show a significant reduction in cognitive or function decline versus placebo in patients with mild-to-moderate Alzheimer's disease in the ReThink-ALZ Phase 3 study."

168.    The press release continued, stating, in relevant part:

[T]he topline results from the ***Phase 3 ReThink-ALZ study of simufilam in mild-to-moderate AD did not meet each of the pre-specified co-primary, secondary and exploratory biomarker endpoints***. The co-primary endpoints were the change in cognition and function from baseline to the end of the double-blind treatment period at week 52, assessed by the ADAS-COG12 and ADCS-ADL scales, comparing simufilam to placebo. Simufilam continued to demonstrate an overall favorable safety profile.

169.    The press release also quoted Defendant Barry as stating:

The results are disappointing for patients and their families who are living with this disease and physicians who have been looking for novel treatment options. We took careful measures to enroll patients with mild-to-moderate AD. Despite that, the loss of cognition in the placebo group was less pronounced than was previously reported in other placebo-controlled studies in AD. We are working to understand this better . . . ***A result like this has implications in our second Phase 3 trial, ReFocus-ALZ. We have made the difficult decision to discontinue ReFocus-ALZ, given the nature of today's reported results***. The complete 52-week dataset will be available

from the study along with a large portion of 76-week data. We intend to report detailed analyses of both studies in the future. ***We will also be discontinuing the Open Label Extension study.***

***November 25, 2024 Business Call***

170.     Later that same day, the Company also held a business update call to discuss the

Phase 3 study topline results (the "November 25, 2024 Business Call").

171.     During the November 25, 2024 Business Call, Defendant Barry stated, in relevant

part:

> As outlined in our press release, the study failed to meet each of its prespecified co-primary endpoints as well as its secondary endpoints and exploratory plasma biomarker endpoints.
>
> [. . .]
>
> We took careful measures to enroll patients with mild to moderate Alzheimer's. Despite that, the loss of cognition in the placebo group was less pronounced than was previously reported in other placebo-controlled studies in AD. We're working to understand this better. The results are disappointing for patients and their families who are living with this disease and physicians who have been looking for novel treatment options.
>
> A result like this has implications on our second Phase 3 trial, ReFocus. We have made the difficult decision to discontinue ReFocus-ALZ given the nature of today's results. Complete 52-week dataset will be available from this study, along with a large portion of the 76-week data. We intend to report detailed analyses of both studies in the future. We will also be discontinuing the Open Label Extension study.

172.     Analysts reacted negatively to this news, with Jones Research that same day issuing

a "Hold" rating for Cassava, and emphasizing in its reasoning that simufilam "failed to show a

significant reduction in cognitive or functional decline versus placebo in mild-to-moderate

Alzheimer's disease patients." The Jones Research report further stated that the "trial failed to meet

the pre-specified co-primary, secondary and exploratory biomarker endpoints," and that the

Company had discontinued the Phase 3 REFOCUS-ALZ and open label extension study as the

reasons for its downgrade.

173.    On this news, the price per share of the Company's common stock fell by $22.18, or approximately 83.8%, from a closing price of $26.48 on November 22, 2024, to close at $4.30 on November 25, 2024.

**_March 25, 2025 Press Release_**

174.    The truth fully emerged on March 25, 2025 when Cassava issued a press release reporting the topline results from the second Phase 3 study, REFOCUS-ALZ, titled "Cassava Sciences Reports Topline Phase 3 REFOCUS-ALZ Data" (the "Simufilam Discontinuation Press Release").

175.    The Simufilam Discontinuation Press Release announced that "[s]imufilam did not show a significant reduction in co-primary endpoints of cognitive or functional decline verses placebo in patients with mild-to-moderate Alzheimer's disease," and that "Cassava's Alzheimer's disease development program with simufilam will be discontinued by the end of Q2 2024."

176.    The Simufilam Discontinuation Press Release further stated, in relevant part:

> Topline data indicate that REFOCUS-ALZ did not meet each of the prespecified co-primary, secondary, and exploratory biomarker endpoints. The co-primary endpoints were the change in cognition and function from baseline to the end of the double-blind treatment period at week 76, assessed by the ADAS-COG-12 and ADCS-ADL scales, comparing simufilam to placebo. REFOCUS-ALZ enrolled 1,125 patients and was discontinued on November 25, 2024, following the report that a prior 52-week Phase 3 study, RETHINK-ALZ, did not meet its co-primary endpoints. A large portion of subjects enrolled in REFOCUS-ALZ completed their final study visit prior to the termination of the trial. Simufilam continued to demonstrate an overall favorable safety profile.

177.    The Simufilam Discontinuation Press Release also quoted Defendant Barry as stating:

> Topline data indicate that REFOCUS-ALZ did not meet each of the prespecified co-primary, secondary, and exploratory biomarker endpoints. The co-primary endpoints were the change in cognition and function from baseline to the end of the double-blind treatment period at week 76, assessed by the ADAS-COG-12 and ADCS-ADL scales, comparing simufilam to placebo. REFOCUS-ALZ enrolled

1,125 patients and was discontinued on November 25, 2024, following the report that a prior 52-week Phase 3 study, RETHINK-ALZ, did not meet its co-primary endpoints. A large portion of subjects enrolled in REFOCUS-ALZ completed their final study visit prior to the termination of the trial. Simufilam continued to demonstrate an overall favorable safety profile.

178. Defendant Barry also stated in the Simufilam Discontinuation Press Release that the Company remained "dedicated to [its] mission of developing novel medicines for central nervous system disorders." To that end, Barry announced, the Company had "initiated preclinical studies to evaluate simufilam's potential as a treatment for TSC-related epilepsy."

179. On this news, the price per share of Cassava's common stock dropped $0.90, or approximately 32.1%, from a closing price of $2.80 on March 24, 2025, to a close at $1.90 on March 25, 2025. This represented a total decrease from the beginning of the Relevant Period, at which point the price per share of Cassava's common stock was $14.86, of $12.96, or a staggering 87%.

## DAMAGES TO CASSAVA

180. As a direct and proximate result of the Individual Defendants' misconduct, Cassava has lost and will continue to lose and expend many millions of dollars.

56. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy judgments associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

57. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

58. Such expenditures will also include costs incurred in any internal investigations

pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

181. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

182. As a direct and proximate result of the Individual Defendants' conduct, Cassava has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## <u>DERIVATIVE ALLEGATIONS</u>

183. Plaintiffs bring this action derivatively and for the benefit of Cassava to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Cassava, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof.

184. Cassava is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

185. Plaintiffs are, and have been at all relevant times, shareholders of Cassava. Plaintiffs will adequately and fairly represent the interests of Cassava in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

186. Plaintiffs incorporate by reference and reallege each and every allegation stated above as if fully set forth herein.

187. A pre-suit demand on the Board of Cassava is futile and, therefore, excused. At the time of filing of this Amended Complaint, the Board consists of the following eight individuals: Defendants Barry, Anderson, Gravier, Gussin, Nicaise, O'Donnell, and Scannon (the "Current Director-Defendants") and non-party Dawn Carter Bir (collectively, with the Current Director-Defendants, the "Current Directors"). Plaintiffs need only to allege demand futility as to four of the eight Current Directors who are on the Board at the time this Amended Complaint is filed.

188. Demand is excused as to all of the Current Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

189. In complete abdication of their fiduciary duties, the Current Director-Defendants either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors during the Relevant Period. Moreover, the Current Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Current Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

190. Additional reasons that demand on Defendant Barry is futile follow. Defendant

Barry has served as the Company's CEO since September 2024 and as a Company director since June 2021. During the Relevant Period, he served as the Chairman of the Audit Committee and as the Chairman of the Nominating and Corporate Governance Committee. Also during the Relevant Period, Defendant Barry served as Executive Chairman of the Board from July 2024 to September 2024. Moreover, the Company provides Defendant Barry with his principal occupation for which he receives substantial compensation. Thus, as the Company admits, he is a non-independent director. As a trusted Company director and as CEO during the Relevant Period, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Barry solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to re-elect Defendants Barbier and Scannon to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As CEO, President, and Chairman of the Board, Defendant Barbier was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the statements he personally made, including but not limited to the 2023 10-K, which he signed; the July Open Letter; the Q2 2024 10-Q, which he signed both the document and the attached SOX certifications for; his remarks at the Wainwright Conference; the October Open Letter; and the Q3 2024 10-Q, which he signed both the document and the attached SOX certifications for. In addition, Defendant Barry is also named as a defendant in the Securities Class Action. For these reasons, Defendant Barry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

191. Additional reasons that demand on Defendant Anderson is futile follow. Defendant

Anderson has served as a Company director since December 2023. He also serves as Chair of the Nominating and Governance Committee and as a member of the Audit Committee. Moreover, he has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Anderson solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to re-elect Defendants Barbier and Scannon to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Anderson also signed the false and misleading 2023 10-K. For these reasons, Defendant Anderson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

192.    Additional reasons that demand on Defendant Gravier is futile follow. Defendant Gravier has served as a Company director since December 2023. He also serves as Chair of the Audit Committee. Moreover, he has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Gravier solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to re-elect Defendants Barbier and Scannon to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Gravier also signed the false and misleading 2023 10-K. For these reasons, Defendant Gravier breached his fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

193.     Additional reasons that demand on Defendant Gussin is futile follow. Defendant Gussin has served as a Company director since 2003. Defendant Gussin also serves as a member of the Audit Committee and as a member of the Compensation Committee. Moreover, he has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Gussin solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to re-elect Defendants Barbier and Scannon to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Gussin also signed the false and misleading 2023 10-K. For these reasons, Defendant Gussin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

194.     Additional reasons that demand on Defendant Nicaise is futile follow. Defendant Nicaise has served as Chairman of the Board since September 2024 and as a Company director since December 2023. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Governance Committee. Moreover, he has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets.

Moreover, Defendant Nicaise solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to re-elect Defendants Barbier and Scannon to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Nicaise also signed the false and misleading 2023 10-K. For these reasons, Defendant Nicaise breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

195.    Additional reasons that demand on Defendant O'Donnell is futile follow. Defendant O'Donnell has served as a Company director since 1998. Moreover, he has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant O'Donnell solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to re-elect Defendants Barbier and Scannon to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant O'Donnell also signed the false and misleading 2023 10-K. For these reasons, Defendant O'Donnell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

196.    Additional reasons that demand on Defendant Scannon is futile follow. Defendant Scannon has served as a Company director since 2007. Moreover, he has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and

engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Scannon solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to re-elect Defendants Barbier and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Scannon also signed the false and misleading 2023 10-K. For these reasons, Defendant Scannon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197.    In the event the Court determines that demand futility should be analyzed with respect to the membership of the Company's Board on March 18, 2024 (the "Initial Board"), the date that the first of the pre-consolidation cases was initiated, demand would nonetheless be excused as futile.[3]

198.    A pre-suit demand on the Initial Board is futile and, therefore, excused. At the time of filing on March 18, 2024, the Initial Board consisted of the following nine individuals: Defendant Barbier and the Current Director-Defendants (collectively, the "Director-Defendants") and non-party Sanford R. Robertson (collectively, with the Current Directors, the "Directors"). Plaintiffs need only to allege demand futility as to five of the nine Directors who were on the Initial Board.

199.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, which renders the Director-Defendants unable to

---

[3] Demand futility is examined with respect to the membership of the Board at the time the amended complaint is filed unless the asserted terms are "validly in litigation" at the time of the original complaint. *Braddock v Zimmerman*, 906 A.2d 776, 778-79 (Del. 2006).

impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

200. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

201. Additional reasons that demand on Defendant Barbier is futile follow. Defendant Barbier is the Company's founder and served as its President, CEO, and Chairman of the Board from 1998 to July 15, 2024. Additionally, Defendant Barbier served as a Company director from 1998 to September 13, 2024. The Company used to provide Defendant Barbier with his primary occupation, for which he received handsome compensation. Thus, as the Company admits, he was a non-independent director. As CEO, President, and Chairman of the Board, Defendant Barbier was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the statements he personally made in numerous press releases during the Relevant Period and the statements in the 2023 10-K and the Q1 2024 10-Q, which he signed both the document and the attached SOX certifications for. As the Company's highest officer and as trusted Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Barbier solicited the false

and misleading 2024 Proxy Statement, which led to shareholders voting, *inter alia*, to re-elect Defendants Scannon and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Barbier is also named as a defendant in the Securities Class Action. For these reasons, Defendant Barbier breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

202. Additional reasons that demand on the Board is futile follow.

203. Defendants Barry, Gussin, Anderson, and Gravier served as members of the Audit Committee (the "Audit Committee Defendants") during the Relevant Period. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period and in violation of the Audit Committee Charter, the Audit Committee Defendants engaged in or permitted the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately review and discuss the Company's quarterly and annual reports filed with the SEC; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus the Audit Committee Defendants further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

204. In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Director-Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Ethics. Thus, the Director-Defendants breached the Company's own Code of Ethics, are not disinterested, and demand is excused as to them.

205. Cassava has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Cassava any part of the damages Cassava suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

206. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

207. The acts complained of herein constitute violations of fiduciary duties owed by Cassava's officers and directors, and these acts are incapable of ratification.

208. The Director-Defendants may also be protected against personal liability for their

69

acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Cassava. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue the Individual Defendants or certain of the officers of Cassava, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

209.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Cassava to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

210.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

211.    Similarly, for all of the reasons set forth above and if the Court so chooses, all of the Director-Defendants, and if not all of them, at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Initial Board is excused as futile.

**FIRST CLAIM**
**Against Defendants Barry, Anderson, Barbier, Gravier, Gussin, Nicaise, O'Donnell, and Scannon for Violations of Section 14(a) of the Exchange Act**

95.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

96.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

97.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

98.     Under the direction and watch of Defendants Barry, Anderson, Barbier, Gravier, Gussin, Nicaise, O'Donnell, and Scannon, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

71

99.     Additionally, the 2024 Proxy Statement further failed to disclose, *inter alia*, that: (1) the Company's own internal investigation had determined that Dr. Wang's laboratory "was unacceptable and temporarily not qualified" to provide Cassava *any* research services; (2) as a result of Dr. Wang's work with Defendant Burns, the DOJ and SEC were investigating Cassava, Defendant Burns, and Defendant Barbier; (3) as a result of the foregoing, the information regarding simufilam's effectiveness was unreliable; (4) the unadulterated data from simufilam's Phase 2 Study did not evidence the drug's potential as an effective Alzheimer's treatment; (5) simufilam's Phase 3 study would yield similarly unimpressive results concerning the drug's effectiveness; (6) simufilam would be incapable of hindering the progression of Alzheimer's Disease even in mild to moderate cases; (7) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; and (8) the Company failed to maintain adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

100.     In the exercise of reasonable care, Defendants Barry, Anderson, Barbier, Gravier, Gussin, Nicaise, O'Donnell, and Scannon should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the election of directors.

101.     The false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of the Defendants Barbier and Scannon, which allowed them to continue to breach their fiduciary duties to the Company.

102.     The Company was damaged as a result of Defendants Barry's, Anderson's,

Barbier's, Gravier's, Gussin's, Nicaise's, O'Donnell's, and Scannon's material misrepresentations and omissions in the 2024 Proxy Statement.

103. Plaintiffs, on behalf of Cassava, have no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

104. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

105. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Cassava's business and affairs.

106. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

107. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Cassava.

108. In breach of their fiduciary duties owed to Cassava, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's own internal investigation had determined that Dr. Wang's laboratory "was unacceptable and temporarily not qualified" to provide Cassava *any* research services; (2) as a result of Dr. Wang's work with Defendant Burns, the DOJ and SEC were investigating Cassava, Defendant Burns, and Defendant Barbier; (3) as a result of the foregoing, the information regarding simufilam's effectiveness was unreliable; (4) the unadulterated data from simufilam's Phase 2 Study did not evidence the drug's potential as an effective Alzheimer's treatment; (5) simufilam's

Phase 3 study would yield similarly unimpressive results concerning the drug's effectiveness; (6) simufilam would be incapable of hindering the progression of Alzheimer's Disease even in mild to moderate cases; (7) the Company failed to maintain adequate and effective data management controls and procedures for its drug research programs; and (8) the Company failed to maintain adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

109.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

110.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

111.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Cassava's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

112.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

113.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Cassava has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

114.    Plaintiffs, on behalf of Cassava, have no adequate remedy at law.

### THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

115.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

116.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Cassava.

117.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Cassava that was tied to the performance or artificially inflated valuation of Cassava or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

118.    Plaintiffs, as shareholders and representatives of Cassava, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

119.    Plaintiffs, on behalf of Cassava, have no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

120.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

121.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Cassava, for which they are legally responsible.

122.    As a direct and proximate result of the Individual Defendants' abuse of control, Cassava has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

123.    Plaintiffs, on behalf of Cassava, have no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

124.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

125.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Cassava in a manner consistent with the operations of a publicly-held corporation.

126.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Cassava has sustained and will continue to sustain significant damages.

127.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

128.    Plaintiffs, on behalf of Cassava, have no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

129.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

130.    The Individual Defendants caused the Company to pay the Individual Defendants

excessive salaries and fees, to the detriment of the shareholders and the Company.

131. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Cassava to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

132. As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

133. Plaintiffs, on behalf of Cassava, have no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Barbier, Barry, Burns, Kupiec, and Schoen for Contribution Under Sections 10(b) and 21D of the Exchange Act

134. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

135. Cassava and Defendants Barbier, Barry, Burns, Kupiec, and Schoen are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the willful and/or reckless violations of their obligations as officers and/or director of Cassava by Defendants Barbier, Barry, Burns, Kupiec, and Schoen.

136. Defendants Barbier, Barry, Burns, Kupiec, and Schoen because of their positions of control and authority as former CEO, CEO and Chairman, former Senior Vice President of Neuroscience, former CMO, and CFO, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Cassava, including the

wrongful acts complained of herein and in the Securities Class Action.

137.     Accordingly, Defendants Barbier, Barry, Burns, Kupiec, and Schoen are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

138.     As such, Cassava is entitled to receive all appropriate contribution or indemnification from Defendants Barbier, Barry, Burns, Kupiec, and Schoen.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiffs may maintain this action on behalf of Cassava, and that Plaintiffs are adequate representatives of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Cassava;

(c)     Determining and awarding to Cassava the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Cassava and the Individual Defendants to take all necessary actions to reform and improve Cassava's corporate governance and internal procedures to comply with applicable laws and to protect Cassava and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of Cassava to nominate at least four candidates for election to the Board;

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Cassava restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Date: December 18, 2025

Respectfully Submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Lead Counsel for Plaintiffs*

## <u>VERIFICATION</u>

I, Guillermo Marti, am a plaintiff in the within action. I have reviewed the allegations made in this Amended Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17__ day of December, 2025.


Guillermo Marti

## <u>VERIFICATION</u>

      I, Felicia Marti, am a plaintiff in the within action.  I have reviewed the allegations made in this Amended Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

      I declare under penalty of perjury that the foregoing is true and correct.  Executed this 17__ day of December, 2025.

_____
Felicia Marti

**VERIFICATION**

  I, Jose Garza, am a plaintiff in the within action. I have reviewed the allegations made in this Amended Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

  I declare under penalty of perjury that the foregoing is true and correct. Executed this 15 __ day of December, 2025.

Jose Garza